PUBLIC SERVICE GAS COMPANY, APPELLANT, v. BOARD OF PUBLIC UTILITY COMMISSIONERS ET AL., RESPONDENTS.

CITY OF PASSAIC, APPELLANT, v. BOARD OF PUBLIC UTILITY COMMISSIONERS ET AL., RESPONDENTS.

CITY OF PATERSON, APPELLANT, v. BOARD OF PUBLIC UTILITY COMMISSIONERS ET AL., RESPONDENTS.

Argued December 1 and 2, 1913—Decided December 9, 1914.

When a public utility corporation is in the enjoyment of privileges to use streets and public places in this state for the purposes of its business, whether such privileges be conferred by the state alone, or partly by the state and partly by the municipality, and whether they be exclusive or subject to duplication, such

582    COURT OF ERRORS AND APPEALS.

Pub. Serv. Gas Co. v. Bd. Pub. Utility Com'rs.    *87 N. J. L.*

privileges constitute a special franchise which is property, is subject to taxation and has normally a substantial value; and in making a valuation of the property of such corporation for the purpose of establishing a basis for the regulation of rates to be paid to it by the public for its product or service, it is erroneous to assign no value, or a merely nominal value, to such franchise when a substantial value is fairly reflected in the total market value of its securities.

On appeal from the Supreme Court, whose opinion is reported in 84 *N. J. L.* 463.

For the Public Service Gas Company, appellant, *Frank Bergen* and *Robert H. McCarter.*

For the Board of Public Utility Commissioners, *Frank H. Sommer.*

For the cities of Paterson and Passaic, *Edward F. Merrey, Albert O. Miller* and *George L. Record.*

The opinion of the court was delivered by

PARKER, J.   These are cross-appeals from a decision of the Supreme Court affirming on cross-writs of *certiorari* an order of the board of public utility commissioners fixing the rate for gas in the territory called the Passaic division at ninety cents per thousand feet.   The issues involved are so fully and clearly stated in the comprehensive opinion delivered for the Supreme Court by Mr. Justice Swayze, that any repetition of them here should be quite unnecessary; and we therefore pass directly to a consideration of the points in dispute.

The Supreme Court dismissed the two writs of *certiorari* wherein the city of Paterson and the city of Passaic were respectively prosecutors, on the ground that *certiorari* was not the proper method for the cities to obtain the relief which they sought, viz., a rate less than that fixed by the commission, which latter rate they claimed was fixed at too high a figure.   It was held in effect that on *certiorari* the Supreme Court had simply the alternative of affirming the order of

the commissioners or setting it aside, whereas the relief then sought by the cities could appropriately be given by the Supreme Court, if at all, only on an application for *mandamus*. The Supreme Court therefore dismissed the two writs prosecuted by the cities. With this conclusion we agree and have nothing to add to the reasoning of the Supreme Court in that regard. On the appeals of Paterson and Passaic the judgment below will be affirmed.

This leaves for consideration the appeal of the gas company. The steps taken by the utility board in fixing the rate were, broadly speaking, to ascertain what would be a fair net income rate upon the value of the property as between the stockholders and the public, and further to ascertain the fair value of the property upon which such income should be figured as a basis. The board adopted the income rate of eight per cent. as being fair under all the circumstances; and after a lengthy hearing fixed the total valuation of the property upon which to compute the income. Its determination in both respects was challenged in the Supreme Court and there affirmed; and the affirmance is challenged in both respects here.

We need take up no time in considering the right of the state to regulate the rates charged by a public utility for its services or products, or the jurisdiction conferred by our statutes upon the board of public utilities to act as a legislative agency in that regard; for no question is raised in either of these respects by any of the parties to this suit.

The complaint is that neither the rate nor the valuation can be supported upon the evidence before the board. The Supreme Court on *certiorari* considered not only this question, but under its broad powers in cases of *certiorari* dealt also to some extent with the weight of evidence, and itself determined upon the evidence that the findings of the utility board were right. This determination of the Supreme Court under the fundamental and well understood rules governing the practice of this court as a reviewing tribunal, will not be overturned in this court if there was any legal evidence to support the Supreme Court findings.

With this preface we turn to the specific matters brought to our attention by counsel. First, with respect to the eight per cent. rate, it is proper to say that the attack thereon made in the Supreme Court appears to have been rather formal than substantial—at least it was so regarded by that court— and no very special stress was laid upon it here. At the same time we have given it due consideration, and it is sufficient to say that upon an examination of the case we conclude that there was sufficient to support the finding below that eight per cent. upon the true value of the properties is a fair and lawful rate of income to be taken into consideration with the expenses and other outgo in determining what price should be charged to the consumers for gas.

The strenuous contest is made with respect to the true value of the defendant's property which is to be used as a basis for the application of the eight per cent. rate. This value the utilities board considered in great detail and held, generally speaking, that it was composed of the two elements of physical valuation and going value, and that all the various elements of value could be classified under one or the other of these two heads. It fixed a separate valuation for each of these two elements and its results are attacked in both respects. So far as relates to the first element, that of the value of the physical properties, there was a great mass of expert testimony adduced before the commission, which in the course of a lengthy and thorough memorandum or report, fixed the value of the land at $111,160, of the manufacturing plant at $1,161,550, and of the distribution system at $2,465,270, a total of about four and three-quarter millions, less some depreciation due to lapse of time. This valuation was specifically affirmed by the Supreme Court. 84 *N. J. L.* 476. It was amply supported by evidence and therefore the finding of the Supreme Court will not be disturbed here.

Counsel argue that the result reached by the board of utility commissioners on this point was what they call a "quotient" verdict, in that the board adopted neither the higher nor the lower valuation placed upon the property by the expert witnesses, but fixed a figure between the two.

But there is absolutely nothing to indicate any improper procedure by members of the board in reaching this result; they were manifestly entitled, upon the evidence before them, to conclude that the valuation stated by one set of experts was too high and that stated by the other set was too low, and to ascertain upon all the testimony what, in their best judgment, was the true valuation. As was said by the Supreme Court: "Their method was not an exact one, but perhaps the result was as good as could be expected from the variance in the testimony." Findings of this character by juries are so common that it is difficult to believe the quotient verdict theory is seriously pressed. We conclude, then, that there was no error in the action of the Supreme Court in affirming the finding of the commissioners upon the valuation of the physical property. There seems to have been an allowance of $250,000 made by the board for what it calls "working capital" which should be added to the above, and with respect to which we do not understand that any particular disagreement exists.

This brings us to the other main element of value, called by the commission the total value of all the intangible property of the company, and which the board estimated at thirty per cent. of the valuation assigned by them to the structural plant. This, as the board expressly stated, included everything outside of the tangible property and associated plant assets, such as working capital. They expressly included preliminary outlay, such as engineering and legal expenses, canvassing, costs of incorporation, cost of securing franchises, financing, banker's commission, deficit in operating during the earlier years, and inadequate early returns upon the investment; also "the entire value of all franchises, primary or secondary, possessed or exercised by the company in the Passaic division." Two or three other specific intangible elements were included that need no notice here. Nothing was allowed for good will.

In discussing the matter of franchises, the commission remarked that its finding as to the total amount of intangible property was "tantamount to including the franchises of the

586    COURT OF ERRORS AND APPEALS.

Pub. Serv. Gas Co. v. Bd. Pub. Utility Com'rs.    87 N. J. L.

company at a moderate rating, at a value comparable to the cost of obtaining these or similar franchises. It amounts, therefore," say the commissioners, "to a practical denial of the company's contentions as to the value of its franchises." The board stated that it is the public policy of the state not to allow the capitalization of franchises for an amount in excess of the actual cost involved in obtaining said franchises; evidently referring to paragraph F, of section 18, of the Utilities act. *Pamph. L.* 1911, *p.* 381. We find difficulty in ascertaining from the report the method adopted by the commissioners for valuation of the franchises. In one place they announce that such value is included in the thirty per cent. estimate of all the intangible property; in other places they say that there is no evidence before them to show that these franchises should be valued at any more than the cost of obtaining them; in their general summary of valuations the franchises are listed as an item and no value assigned thereto, and the next item consists of patent rights, which the commission expressly declare to have no value whatever; and yet the commission conceded that special franchises are property; that when tangible property is operated under franchise rights, the instrument of public service is worth more than the material and labor involved in its construction; that taxation is imposed in respect of special charters as "property" in this and other states; and that neither franchise nor any other property can be taken for public use without just compensation. These are extracts from the report in its exact language. In dealing with this question the Supreme Court seems to have gone a step further, for it held that "logically no allowance should be made for the value of the special franchises in a case where it is not legally exclusive and where the state still retains the right to fix rates." 84 *N. J. L.* 482.

We find ourselves unable to concur in this result. Without adopting in its entirety the rule laid down in our railroad tax cases, that the total valuation of the property and franchises should be gauged by the market value of the outstanding corporate securities plus floating debt, and that

MARCH TERM, 1915. 587

87 N. J. L.    Pub. Serv. Gas Co. v. Bd. Pub. Utility Com'rs.

therefore the value of the franchises would be indicated by the difference between this total and the sum of the value of the physical plant plus development cost; and conceding that in most of the cases of public utilities the privilege of utilizing the public domain is not exclusive, and is therefore subject to invasion by other similar utilities, and conceding also that charters and local franchises are often granted by the state or the municipality without a cash or property consideration, the conviction still remains that such franchises have substantial value. We often hear of old charters being bought up for use by new enterprises. The very charter of the appellant seems to be one of this class. It seems a fallacy to say that if and because a municipality confers upon a gas company or a street railway company the privilege of using the public streets without any consideration in cash or property passing from the company, the rights thereby conferred should have no value for rate-making purposes; for this disregards at least the meritorious consideration that the promoters of the company have invested their money and given their time and taken their business risks in view of the making of this very concession, and the value of the enterprise on which the owners are entitled to draw an income should not be limited to the mere cash that they have put into it, but should include something for the risk and responsibility that they have taken in organizing and developing it.

It is true, as the board remarked, that the Utilities act forbids the capitalization of franchises. This prohibition, however, refers to the inclusion of a franchise valuation in the par value of capital stock, but does not affect its market value. Just as the value of a bank stock may be and often is legitimately enhanced by public confidence in the directors of a bank and the methods of its business management (*Newark* v. *Tunis*, 81 *N. J. L.* 45; 82 *Id.* 461), so the market value of the securities of a public utility may be enhanced in part at least by the fact that it is operating under a municipal franchise costing little or nothing in cash outlay, subject, it may be, to duplication, but which the public has the right to

588    COURT OF ERRORS AND APPEALS.

Pub. Serv. Gas Co. v. Bd. Pub. Utility Com'rs.    *87 N. J. L.*

suppose in a proper case will follow the general run of such franchises and be free from indiscriminate competition, although not legally exclusive. Such a situation would be a legitimate element of market value and would be taxable, as reasonably and fairly enhancing the value of the property in the public mind. It would thus be capitalized, not by the utility itself but by the public as a business matter, and against such capitalization there is no prohibition, legislative or otherwise.

It seems a work of supererogation to cite authorities for the proposition that franchises are "property" and that the courts will protect them, not to speak of their being subject to taxation. As we have seen, the board itself conceded that they were property and the Supreme Court did likewise. Still, a glance over some of our decisions will do no harm.

In 1878, Vice Chancellor Van Fleet, in the case of *Jersey City Gas Co.* v. *Dwight,* 29 *N. J. Eq.* 242, dealing with a special gas company charter granted in 1849, held that while the business of making and selling gas is not a prerogative of government, the right to use the public streets to lay gas pipes therein is a franchise which the state alone can confer. He held, further, "that a franchise is property, which, like every other thing susceptible of private ownership, is under the protection of the law;" and that a "grant of a franchise by the state, is, by its own intrinsic force, and without express words, exclusive against all persons but the state, and that any attempt to exercise like rights and privileges, without legislative authority, is a fraud and an unwarrantable usurpation of power." Accordingly, on the complaint of a duly incorporated gas company invested by its charter (*Pamph. L.* 1849, *p.* 279) with the right to lay pipes in the streets of Jersey City, he enjoined such laying of pipes by defendants claiming incorporation under the General Gas Company act of 1876 (*Comp. Stat.; p.* 3142), whose attempted incorporation he adjudged invalid. The complainant in that case acquired its franchise to lay and maintain pipes in Jersey City directly from the state; so, apparently, did the Public Service Gas Company, which, as we are given to understand, is the same

MARCH TERM, 1915. 589

87 *N. J. L.*    Pub. Serv. Gas Co. v. Bd. Pub. Utility Com'rs.

corporation chartered as the "Oxy-Hydrogen Company of the United States." *Pamph. L.* 1873, *p.* 1442. By the Gas Company act of 1876, *ubi supra,* companies organized thereunder were vested with the right to lay pipes, &c., upon obtaining the written consent of the municipal authorities and under such regulations as they may prescribe. This section (17) was amended to include boroughs in 1902. *Pamph. L., pp.* 229, 231. That the power to grant the franchise was delegated in part, does not affect the main proposition that it is a franchise, and is property.

The decision in Jersey City *v.* Dwight was overruled so far as related to the power of the Court of Chancery to inquire into the legality of the organization of a *de facto* corporation. *National Docks Railroad Co.* v. *Central Railroad Co., 32 N. J. Eq.* 755. The Vice Chancellor recognized this later in *Elizabethtown Gas Light Co.* v. *Green, 46 Id.* 118, where he denied an injunction in a similar case, and his decision was sustained by this court. 49 *Id.* 329. But the status of a gas franchise as property, and the right of a court of equity to enjoin its unlawful invasion, were reaffirmed in an opinion by Vice-Chancellor Leaming in *Millville Gas Light Co.* v. *Vineland Light and Power Co., 72 Id.* 305, a preliminary injunction being denied on the sole ground that the case was not sufficiently clear. In *Township of Landis* v. *Millville Gas Light Co., Id.* 347, he awarded a preliminary injunction against unwarranted use of the highways, and on appeal this court referred with approval to his opinions in both cases. 73 *Id.* 739, 740. A similar ruling was made by Vice Chancellor Emery in the case of unlawful usurpation of highways by a water company. *Franklin Township* v. *Nutley Water Co., 53 Id.* 601. The law courts have similarly dealt with this privilege as a legal franchise, depending on compliance with conditions precedent. In *People's Gas Light Co.* v. *Jersey City, 46 N. J. L.* 297, the Supreme Court, on the complaint of two gas companies, set aside on *certiorari* a grant of street privileges to a third gas company for irregular procedure, saying that "beside the common interest which every citizen has in preserving the streets for public travel, these two corporations

590     COURT OF ERRORS AND APPEALS.

Pub. Serv. Gas Co. v. Bd. Pub. Utility Com'rs.     87 N. J. L.

have special business privileges which they are entitled to protect against any unlawful rivalry."

The status of such local franchises as property is emphasized when we consider the provisions made by the legislature for taxing them, and the deliverances of our courts in tax cases. The broad doctrine that corporate franchises generally are property, and are taxable as such, laid down in the leading case of *State Board of Assessors* v. *Central Railroad Co.,* 48 *N. J. L.* 146, has stood unimpaired to this day, and the machinery and procedure for ascertaining the value of a railroad franchise for purposes of taxation are familiar to all who have read that case and the line of decisions based thereon. In that case the franchise was a state franchise, as, perhaps, also in the case at bar. In the cases, however, of street railways, gas and electric light companies, water companies, and the like, the franchises partake of a local as well as of a state character, but are similarly property, and taxable if the legislature choose to tax them. Thus, in *Passaic Water Co* v. *Paterson,* 56 *Id.* 471, it was held by the Supreme Court that the "corporate franchise" of the water company was property, and taxable, the inquiry then being whether the language of the supplement of 1866 to the General Tax act of 1846 contemplated its taxation locally, and it was held that it did not. That decision was followed by this court in *North Jersey Street Railway Co.* v. *Jersey City,* 74 *Id.* 761.

In 1900, the taxing authorities of Newark undertook to tax the franchise of a street railway company under the act of 1866 by calling it an easement, and their action was sustained by the Supreme Court. *Newark* v. *State Board of Taxation,* 66 *N. J. L.* 466. This court, however, reversed that decision, and held that the right to occupy the streets was to be classed as franchise and taxable as such, *i. e.,* by the state board of assessors and not locally. *S. C.,* 67 *Id.* 246. The brief opinion of the present Chief Justice, speaking for this court, illumines the point now under consideration, *i. e.,* whether franchise has substantial value. He said:

"That there is an inherent value in the property of the North Jersey Street Railway Company, over and above the

cost of reproducing its rails, stringers, poles, wires, power house, &c., needs no demonstration. That value, however, springs, not out of any ownership by the company of an interest in the soil of the highways over which its road passes, but out of its ownership of the franchise to maintain and operate its road over those highways, and to collect tolls from all persons traveling upon it. This franchise is property, and taxable as such (*State Board of Assessors* v. *Central Railroad Co., 48 N. J. L.* 146) ; but, under present legislation, the right to tax it has been reserved by the state to itself, through its state board of assessors, and not delegated to the several municipalities through which the company's road passes."

These decisions were based on the Tax act of 1846 and the supplement of 1866.

In 1900, the legislature passed an act to tax the property and franchises of all corporations using public streets, &c., except those taxable as railroads. This statute is commonly known as the "Voorhees act." *Pamph. L.* 1900, *p.* 502; *Comp. Stat., p.* 5298.

It provides a general scheme for the local taxation of tangible property and a fixed franchise tax of two per cent. of the gross receipts, to be divided *pro rata* among the municipalities in which the corporation operates.

The constitutionality of the act was challenged and sustained by the Supreme Court. *North Jersey Street Railway Co.* v. *Jersey City, 73 N. J. L.* 481. The judgment was affirmed in this court. 74 *Id.* 761.

It is significant that by section 8 of the act of 1900, as originally enacted, it was not to apply to any corporation not exercising any municipal franchise. This clause led to litigation by corporations seeking to escape taxation under the act, resulting in the decision of the Supreme Court in *State Board* v. *Plainfield Water Co., 67 N. J. L.* 357, where that court defined a "municipal franchise" as one granted by the legislature upon condition that it shall not be exercised by the grantee without first obtaining the consent of the municipality within whose limits the franchise is to be exercised. The franchise of the water company was held not to be within the

592    COURT OF ERRORS AND APPEALS.

Pub. Serv. Gas Co. v. Bd. Pub. Utility Com'rs.    87 *N. J. L.*

definition. But, in *Paterson and Passaic Gas Co.* v. *State Board,* 69 *Id.* 116; *affirmed,* 70 *Id.* 825, the occupancy of streets by the company pursuant to municipal permission was held to be a municipal franchise and taxable as such. True, the tax on franchise provided by the act of 1900 is held to be a franchise or license tax and not a property tax (*North Jersey Street Railway Co.* v. *Jersey City,* 73 *Id.* 481; 74 *Id.* 761); but this is of no moment in the present inquiry; for nowhere in the line of decisions is it intimated that the franchise itself is not property, while, on the contrary, this court has flatly held, *e. g.,* in *Newark* v. *State Board,* 67 *Id.* 246, *supra,* that it is. And in the North Jersey case just cited the Supreme Court cites *Metropolitan Street Railway Co.* v. *New York,* 199 *U. S.* 1, where it was held that under the New York act of 1899 the franchise could be subjected to both a license tax and a property tax.

It should be unnecessary to remark that our reports would not contain this long line of decisions in earnestly litigated franchise tax cases, were it not a fact that franchises, general or local, state or municipal, have a substantial value of which the taxing authorities are prompt to take advantage, and which value, in tax assessment controversies, the authorities estimate often in large figures. If other evidence of substantial value were needed, it may be found in the fact that as to municipal franchises, the municipality may impose within reason, and the utility must comply with, conditions involving considerable expense. *J. C. & H. R. R. Co.* v. *J. C. & B. R. R. Co.,* 21 *N. J. Eq.* 550. A familiar example is the requirement that a street railway company shall pave between its tracks, or keep the street in repair. *Trenton* v. *Trenton Street Railway Co.,* 72 *N. J. L.* 317; *Freeholders of Hudson* v. *Jersey City, &c., Railway Co.,* 85 *Id.* 179. Indeed, the Voorhees act of 1900 expressly recognizes the lawfulness of a cash rental as a consideration for a franchise to occupy the streets, and applies it on account of franchise tax. If it exceed the franchise tax, the excess must still be paid. Section 7. See *Eatontown* v. *Monmouth County Electric Co.,* 78 *Id.* 493.

The respondents, then, must take and sustain this position: that although by numerous decisions of the Supreme Court, Court of Chancery and of this court, it has been repeatedly declared that the privilege given to public utility corporations, either directly by the state or partially by the state and partly by the municipality as a state agency, and whether exclusive or not, is a franchise, and as a franchise is property, to which the utility in a proper case may assert its special right as against an usurper, and as property is subject to taxation, at the will of the legislature, upon a substantial valuation fixed by the taxing authorities; and though its bestowal may be, and in most cases is, conditioned upon a substantial, valuable consideration in money or contract obligation, yet when in the exercise of its rate-regulating power the legislature deputes an agency to determine a valuation as a basis for the rate, such agency may disregard the unquestionable value that is attached to the franchise for the purpose of yielding an income to the state or its subdivisions, and declare that such franchise has only nominal value for the purpose of yielding income to the utility. We cannot agree to such a proposition. We are aware that some courts have held that a valuation for taxation is not necessarily identical with valuation for rate regulation. This may be so in a measure. Indeed, it is readily conceivable that if the franchise were exempt, as it was claimed to be under the act of 1903 (*North Jersey Street Railway Co. v. Jersey City, supra*), the rate valuation might exceed the tax valuation by the value of the franchise. But, normally, when all the corporate property is subject to taxation and also valued for rate regulation, it would seem reasonable to say that the owner of the property is entitled to a fair income on property for which it is taxed. The fact that the state, or the municipality, or both, have seen fit to confer a franchise in many cases as a gift (so called), or for a consideration deemed inadequate, in view of the advantages conferred, does not, as it seems to us, create any implication in the grant that the value of the franchise should be disregarded in fixing a reasonable rate. Counsel for the company argue that the case of *Willcox v. Consolidated Gas Co.,* 212

594. COURT OF ERRORS AND APPEALS.

Pub. Serv. Gas Co. v. Bd. Pub. Utility Com'rs.    87 N. J. L.

*U. S.* 19, is controlling on this point. *Per contra,* it is argued, that that decision does not touch the question at issue, in that it expressly limits the ruling to cases arising on similar facts. But a reading of the entire opinion will demonstrate, we think, that it is fundamentally grounded on the propositions that franchises are an essential element of the property valuation, that they have a substantial value, and that they should be regarded in fixing a rate. Indeed, the court went so far as to put its *imprimatur* on a franchise value corresponding to an increase in the par value of the stock at the time of the consolidation; and this was the feature especially limited to the case under consideration. In *Smyth* v. *Ames,* 169 *Id.* 466, 544, 547, the same court discountenanced excessive valuation or fictitious capitalization as a basis of rates, but said that (among other things) the amount and market value of the bonds and stock were matters for consideration and were to be given such weight as might be just and right in each case. This corresponds rather closely with the method adopted by the state board of assessors in the case of *Central Railroad Co.* v. *State Board,* 49 *N. J. L.* 1, 7.

Recurring to the argument that these special or municipal franchises are given to the utility, or contributed by the public, and therefore should not be estimated in fixing a rate, we repeat that the minor premise is an unwarranted assumption of fact. A municipality desires street car or gas service. It can, if so authorized by the legislature, build and operate its own plant and equipment. Perhaps the cost of installation is too great, so that there would be no sale for the bonds, or the citizens are unwilling to shoulder the interest charge; perhaps, also, the usual extravagance in operation due to public ownership is a deterrent. It is common knowledge that in this country a public utility is usually operated by the public at a loss or an inadequate return. The economic advantage of private ownership is generally recognized. In this situation, a company is organized and asks a franchise. The risk is all that of the organizers; nothing is risked by the municipality. If it fails, they lose their money. It must operate, however, so long as it does operate,

at a reasonable rate, based on a theoretically economical plant and operating expense. It cannot charge the public more than the service is worth, just because otherwise it will not meet its operating expenses and fixed charges. It must pay its taxes, whether it earns them or not. In short, all such franchises are based on a consideration, viz., the risk and obligation undertaken by their grantees; and it will not do to say that the franchise is a public contribution exclusively.

If the plant and franchise be taken over by the public, the franchise must be paid for like any other property. *Monongahela Navigation Co.* v. *United States,* 148 *U. S.* 312; *Brunswick and Topsham Water District* v. *Maine Water Co.,* 99 *Me.* 371, 59 *Atl. Rep.* 537. In the latter case the legislature expressly recognized that it should be paid for, but the court did not rest on that; on the contrary it said that even in cases where by statute, franchises were not to be included in the valuation, the court conceived that it must have been implied that the property was to be valued as rightfully where it was, and rightfully to be used; adding that the right to use, and charge reasonable tolls, were the franchises, at any rate the most important ones. Our own legislature has in like manner enacted that certain cities may acquire existing water works from their owners by purchase or condemnation; and in such case the property acquired includes the franchises, the value of which is to be a part of the award. *Pamph. L.* 1906, *p.* 664; *Comp. Stat., p.* 850, 852, especially section 7, *placitum* 960. Other such acts no doubt are on the statute book. And such franchises are in no sense exclusive; for by the very act cited, cities affected thereby may ignore an existing plant and build their own water works, subject only, by other legislation, to the approval of the state water supply commission. This was exactly what was attempted in *Collingswood* v. *State Commission,* 84 *N. J. L.* 104, 85 *Id.* 673, and denied on the ground, not that the existing franchise was exclusive, for it was not, but because the commission in the exercise of power conferred on it, decided that such new plant was not needed.

596    COURT OF ERRORS AND APPEALS.

Pub. Serv. Gas Co. v. Bd. Pub. Utility Com'rs.    87 *N. J. L.*

If, as we think is the law, substantial allowance should be made for the franchise of a gas plant if taken for public use, and the value of such franchise paid in money to the owners thereof, we fail to see why, so long as the plant and franchise possessing that value for sale or condemnation are held and operated by the owners, the latter should not be entitled to a reasonable income on all elements of their property including the franchise, in the absence of any charter reservation or contract to the contrary. As was said by the Supreme Court of Maine in the Brunswick case, *ubi supra,* "we apprehend that some difficulty in discussion has arisen from attempting to differentiate in logic what is inseparable in fact. The property taken is a single thing, to which belong certain characteristics which affect its value."

We do not wish to be understood as laying down the doctrine that the value of the franchise is to be measured necessarily by the total market value of outstanding capital stock and indebtedness, less physical valuation and development cost, because this would take no account of inflation of stock values; but if such market value added to indebtedness show an excess, such excess is at least evidential that where there are special franchises, such franchises have some substantial value in excess of the mere outlays for legal advertising and other legitimate expenses in obtaining them. This element was, apparently, expressly excluded both by the commission and by the Supreme Court. This exclusion, in our opinion, was error. We think there was evidence before the commission to indicate that from this standpoint the franchises had a substantial value which the commission refused to give to them, and as the ninety-cent rate fixed by the commission was based on the theory of providing a net income of eight per cent. on the total value of the property of the company, the finding of fact that such rate was just and reasonable was in direct violation of the fundamental theory on which the commission undertook to fix the rates, and is presumably not justified by it. On the appeal of the gas company, therefore, the judgment of the Supreme Court will be reversed and the order fixing the ninety-cent rate will be set aside.

*For affirmance of gas company's appeal*—The Chancel-
lor, Trenchard, Kalisch, Terhune, JJ.  4.

*For reversal*—The Chief Justice, Parker, Bergen, Bo-
gert, Vredenburgh, Heppenheimer, JJ.  6.

*For affirmance of cities' appeals*—The Chancellor,
Chief Justice, Trenchard, Parker, Bergen, Kalisch,
Bogert, Vredenburgh, Terhune, Heppenheimer, JJ.  10.

*For reversal*—None.

At the March Term, 1915, a reargument of these cases was
ordered, which reargument was had on March 3d and 4th,
1915; and on June 14th, 1915, the following opinion was
rendered in the gas company's appeal.

For the appellants, the Public Service Gas Company, *Frank
Bergen* and *Thomas N. McCarter* (*Robert H. McCarter* and
*Richard V. Lindabury* on the brief).

For the respondents, the Board of Public Utility Commis-
sioners, *Frank H. Sommer.*

For the respondents, the cities of Passaic and Paterson,
*George L. Record* (*Edward F. Merrey* and *Albert O. Miller,
Jr.,* on the brief).

Per Curiam.

The judgment under review herein should be affirmed, for
the reasons expressed in the opinion delivered by Mr. Justice
Swayze, in the Supreme Court.

White, J. (concurring).  This case and the two city ap-
peals (Nos. 3 and 4 of this term) present appeals by two
municipalities upon one side and by a public utility company
on the other, from the judgment of the Supreme Court with
respect to an order by the public utilities commission fixing

598    COURT OF ERRORS AND APPEALS.

Pub. Serv. Gas Co. v. Bd. Pub. Utility Com'rs.    87 *N. J. L.*

the rate to be charged the public for gas by the utility company in a district which includes the two municipalities.

I am unable to agree with the Supreme Court that *certiorari* is not the municipalities' remedy in their cases. I know of no other remedy, and, of course, it cannot be that they have none. The commission has fixed a rate of ninety cents, and the municipalities are dissatisfied with the order fixing that rate. They think the rate fixed is too high, just as the utility company thinks the rate too low. Neither can bring *mandamus* because the utilities commission is vested by law with a discretion in fixing the rate. It would be like asking the courts to *mandamus* or order a jury to agree upon a certain smaller named sum as its verdict in a case where a question of fact involving the amount of the verdict was to be decided. The verdict rendered might be too high or too low to accord with the legal principles governing the case, but while a question of fact remains, a *mandamus* or a court direction is out of the question. The remedy is to set the verdict aside. So here the remedy is to set the commission's order aside because erroneous, and the proper procedure to accomplish this is by *certiorari,* irrespective of whether the claim is that the rate fixed is too high or too low. I think, therefore, that the municipalities' cases cannot be dismissed upon the ground stated by the Supreme Court, and that that court having in fact passed upon the facts involved, we should, as it seems to me, now consider these cases also upon the merits.

Two principal questions are involved in the cases before us: one, was it improper to allow an element of "going value" in coming to a valuation of the property of the utility company to be protected in a rate-making order; and the other, was it improper to exclude the element of the commercial value of the franchise (not an exclusive one) in reaching such valuation?

The municipalities maintain the affirmative of the first proposition, and the gas company the affirmative of the second.

Taking up the first inquiry: It is quite evident from the testimony and from the findings of the Supreme Court that with the exception of the commercial value of the franchise, the terms "going value" in these cases embraced what the commission thought was the fair present value of all of the elements of the intangible property of the gas company, including the necessary spark of life represented by adequate permission to use its property for the purposes of its incorporation and in the public streets where it was locally authorized to go. To this extent I think the property of the gas company is entitled to protection in rate-making orders because a failure of such protection permits confiscation. I agree, therefore, with the view of the commission upon this point. To value the present mere physical property of the company in absolute disregard of its previously discharged burdens assumed and performed in the public interest and clearly contemplated by the legislation by which it was invited to enter upon the public service, is in my judgment confiscatory. Likewise, to value it without considering it as endowed with its life-giving permission to continue its public functions would be confiscation.

I therefore favor an affirmance, upon the merits, of the order of the commission in the cases wherein the cities of Paterson and Passaic complained that "going concern value" had been used as an element of value in establishing the rate.

Coming now to the gas company's appeal, wherein the complaint is that an additional value of the franchise (apart from its life-giving function to the company's other property) and dependent upon earnings present and prospective of the company, was not included, I incline to the opinion that the commission took the proper view of this point also.

I take it that this claim must resolve itself into dependence upon one or both of two propositions, viz.—*first*, that the gas company has a property right to continue to charge unreasonably high rates in the future because of the present market value of its securities as a result of its having been suffered to do so in violation of its charter obligations in the past, or *second*, that its charter right to charge reasonable rates is of

itself a valuable property right which must be permitted, under the guise of its own protection, to enlarge itself into a right to charge unreasonable rates.

Taking up the first of these propositions—it is not questioned that the universally acknowledged obligation of the gas company to serve the public at reasonable rates reserves to the public (the state) the right to regulate the rates to be charged so that they shall conform to this obligation. It follows as a necessary corollary that the franchise of the gas company to charge rates is at all times subject to this right of the state to so regulate them. That the granted franchise to charge rates is a property right protected by law, which cannot be destroyed or impaired except by due process of law and upon compensation, and that it, as an element of property value (dependent in amount upon the rate permitted and likely to be permitted to continue) is subject to taxation, seems to me to be quite apparent; but that this fact should not be held to work a forfeiture of one of the conditions of the grant, viz., that the state should have the right at all times to require that the rates charged shall be reasonable, seems to me to be equally clear. A man might build a hotel twenty stories high, at the seashore, and so arranged that nearly half of its guest rooms have an unobstructed ocean exposure and view to the southwest over his neighbor's land, and the probabilities may seem to indicate that, by reason of lack of demand for additional hotel accommodations, or inability, or lack of inclination, of the neighbor to build, that this exposure and view would continue uninterrupted for a long time, and by reason of this advantageous exposure the hotel might be very profitable so that it had a fair market value of $2,000,000. No one would doubt that it could not be condemned and taken by the state or the municipality for any public purpose without the owner being paid this market value, nor could he doubt that it was subject to be taxed at this value; but on the other hand, no one would contend that the owner had thereby acquired a right to prevent his neighbor from building a like hotel, twenty stories high, on his own land, shutting off the ocean exposure and view of the

first one, although the effect of his so doing would be to decrease the market value and the tax value of the first one by a million dollars. If in fact the first hotel had been sold in the interim for $2,000,000, this circumstance would not in any respect alter the ultimate result.

So in the case of a gas franchise, subject as here to reasonable rate regulation by the state, it is quite evident that if the state for what reason soever, and many may be thought of, omits for a great number of years to enforce its rights and thus allows the company to charge unreasonably high rates and there seems every likelihood that this permission of omission would continue, the property value of the franchise in the open market as reflected by the market value of the company's stock would be much higher than it would be if the state had at all times and consistently enforced its rights and there was every prospect that it would continue to do so. Assuming for the purpose of illustration, that an unreasonably high rate has been charged by this company in the past, upon what theory can it be contended that, because of this permissive omission on the part of the state in favor of the company during all these years, the state has now forfeited the rights of the public to enforce a condition which it was always the duty of the company to perform whether the state compelled it to do so or not? I think there is none. I suppose it may fairly be assumed that with all the other conditions exactly as they were in this case at the time of the order, if the rate charged by this company in the district in question before the order had been $1.40 instead of $1.10, the claim of the company to be allowed for value of franchise would have been at least double in amount what it now is, and that the higher property value as indicated by market value of securities and by valuation of franchise for taxation, would have more than substantiated such enlarged claim. Clearly no part of such increase of claim could have any proper foundation for consideration in arriving at a just and reasonable rate, although it would have all the property right backing now urged for the present claim.

I think we may properly conclude, therefore, that the charging of unreasonably high rates in the past, if they have been so charged, can furnish no ground for the continuation of these rates in the future, and this although a shrinkage of commercial and taxing value of the franchise will be the result of the state's enforcement of its contract right to require the rates to be reasonable in the future.

Taking up the second proposition—that the company's charter right to charge reasonable rates is in itself a valuable property right entitled to consideration in rate-making, I suppose it must be conceded that the franchise to charge as a "reasonable rate," sufficient to yield a net profit of eight per cent. on the value of the company's property as allowed and established respectively by the findings of the utilities commission in this case, is a very valuable property right. Certainly I think it is. That this valuable privilege is the company's is beyond question. That it is property is undoubted. That the law protects it against confiscation and subjects it to taxation follows as a matter of course. But that this valuable property right to charge "reasonable rates" should by virtue of its own existence have the effect of converting itself into a still more valuable property right to charge "unreasonable rates," is of course, preposterous. Presumably the incorporators went into this public utility business because they expected that their charter privilege to charge "reasonable rates" for the gas they were to manufacture, distribute and sell, would be a valuable one, but that fact and the fact that it has become so, cannot have the effect of altering the terms of the contract made with the state. The mere statement of this proposition is sufficiently convincing, but if anything more were needed, a glance at the absurd practical result of the contrary view would be illuminating. If the franchise to charge ninety cents in order to pay eight per cent. .on the value of the company's property, not including the franchise, is worth a million dollars and must be included and have eight per cent. paid on it also, the rate would have to be one dollar instead of ninety cents; but if the company has the

property right to charge one dollar, the franchise is worth $2,000,000 instead of one million, and so the rate must be $1.10 in order to pay eight per cent. on this additional million, and so on indefinitely.

That the company's contract with the state to charge "reasonable rates" cannot be thus evaded, is, of course, quite obvious. The plain fact is that the commercial value of the company's property right in its franchise can have no effect in fixing the rate it can charge, because by the terms of its contract with the state the stream of its franchise value arises from the spring of its right to charge "reasonable rates," and in the very nature of things no stream can rise higher than its source.

For the reasons above stated I concur in the affirmance of the judgment of the Supreme Court in the gas company's appeal.

*For affirmance*—THE CHANCELLOR, TRENCHARD, KALISCH, BLACK, WHITE, TERHUNE, JJ.   6.

*For reversal*—THE CHIEF JUSTICE, PARKER, BERGEN, VREDENBURGH, JJ.   4.