INTERSTATE TELEPHONE AND TELEGRAPH COMPANY, PROSECUTOR AND RELATOR, v. BOARD OF PUBLIC UTILITY COMMISSIONERS.

Argued November 6, 1912—Decided March 18, 1913.

1. The effect of chapter 195 of the laws of 1911, entitled "An act concerning public utilities; to create a board of public utility commissioners, and to prescribe its powers and duties" was to vest in that board the final power to pass and approve the legality of a proposed bond issue, payable in more than one year from the date thereof.
2. The effect of said legislation was also to impose upon the board of public utility commissioners the duty of investigating the purpose of a proposed issue of bonds payable in more than one year from the date thereof, and if in its judgment the purpose

of such bond issue will be of doubtful benefit to the applying corporation, and ultimately may result injuriously to the investing public, the board may withhold its power of approval.

3. Unless it clearly appears that there was no evidence to support reasonably such order, or that in making it the board clearly exceeded its jurisdiction, this court will not upon *certiorari* set aside the order thus made.

4. The legal right of the board to make such order being clear, and the question of the jurisdiction of the board to make the order being clear, this court will refuse a writ of *mandamus* to compel the board to reverse its action.

5. The fact that this court may upon a review of the testimony differ from the judgment of the board as to the propriety or correctness of its order, affords no basis for the intervention of the court by way of a review by *certiorari* to set aside the finding of the board, or by way of writ of *mandamus* to compel a substitution of its judgment for that of the board.

On *certiorari* removing order of the defendant, and upon rule to show cause why a *mandamus* should not issue.

Before Justices TRENCHARD and MINTURN.

For the prosecutor and relator, *Mark A. Sullivan* and *John Griffin.*

For the defendant, *Frank H. Sommer.*

For intervening bondholder, *Robert H. McCarter.*

The opinion of the court was delivered by

MINTURN, J.   The legislature by chapter 195 of the laws of 1911 (*Pamph. L., p.* 374), entitled "An act concerning public utilities; to create a board of public utility commissioners, and to prescribe its duties and powers," provided as follows:

"18. No public utility as herein defined shall, (h) without the approval of the board sell, lease, mortgage, or otherwise dispose of, or encumber its property, franchises, privileges or rights or any part thereof * * *" "(e) Hereafter issue any * * * bonds * * * payable in more than one year from the date thereof until it shall have first obtained

authority from the board for such proposed issue. It shall be the duty of the board, after hearing, to approve of any such proposed issue maturing in more than one year from the date thereof, when satisfied that the same is to be made in accordance with law and the purpose of such issue be approved by said board."

The prosecutor in this proceeding presented its application to the board for leave to issue its thirty-year first and refunding mortgage five per cent. gold bonds, in the sum of $1,525,000 for the purpose of exchanging the issue for an outstanding issue of upwards of $2,900,000. The holders of the last-mentioned issue, it was conceded, were willing to accept the proposed new issue in lieu of their present holdings. The effect of this arrangement, it is obvious, was to reduce the bonded indebtedness of the prosecutor from about $2,900,000 to $1,525,000.

It is conceded that the prosecutor in its present *status* is unable to meet the interest on its present bond issue, but at the same time it insists that it will under the new order of things be amply able to meet the interest on the proposed bond issue.

In this posture of affairs the public utility commissioners, after hearing and after consideration of the facts, refused permission to the prosecutor to issue the bonds upon the ground, *inter alia,* that "It appears to the satisfaction of the board that there is no reasonable warrant for the expectation that the company from its earnings can pay the annual interest which the aforesaid issue of bonds would require to be paid."

We are asked now upon this rule to require the board by the issue of the prerogative writ of *mandamus,* to comply with the request of the prosecutor, and reverse in effect the judgment of the board.

Our power to act at all in the premises is furnished by the thirty-eighth section of the Public Utility act, which provides that "The Supreme Court is hereby given jurisdiction to review said order of the board, and to set aside such order when it clearly appears that there was no evidence be-

fore the board to support reasonably such order, or that the same was without the jurisdiction of the board."

The insistence of the prosecutor is that since the effect of its application is to reduce its bonded obligation by about fifty cents on the dollar, and that since the new issue of bonds is to go not to the public at large directly, but to be accepted by the present bondholders, as a substitute for their present holdings, no one can be harmed by the issue; while its direct effect will be to reorganize a company now concededly over capitalized, and place it upon its feet as a factor in the industrial world. This it insists is not only a salutary arrangement for its bondholders and the public, but in nowise contravenes any legal principle or equitable rule.

The conspicuous fact in this case is that the legislature for reasons of public policy, has committed to a special board organized for the purpose, the duty of investigating upon application, all proposed bond issues of public utility corporations, with a twofold object in view—*first,* to ascertain the legality of the issue; and *second,* to ascertain its purpose. When the genesis of this legislation is considered, the fact becomes at once obvious that the inspiring motive of the legislature was to create an administrative or supervisory board upon which should be imposed the duty of stamping its *imprimatur,* not only upon the legality of the financial proposition advanced, but upon the very merits of the subject-matter itself from the standpoint of a wise public policy, which was to have for its ultimate object the safeguarding of the public against ill considered and reckless financial ventures, the obligations of which might prove disastrous to a confiding investing public.

In effect such was the view entertained of substantially similar legislation by the New York Court of Appeals, in *People, ex rel. Third Avenue Railroad Co. et al.,* v. *Public Service Commission,* 203 *N. Y.* 299.

We refer to this legislative object here, for the purpose of emphasizing the fact which a clear recollection of the conditions antedating the act will recall, that an act conferring only such a perfunctory power of legal procedure upon this

board, as is contended for by this prosecutor, would afford little or no relief to meet the emergency which in legislative contemplation confronted the body politic.

In the construction of such legislation, the principle is, of course, axiomatic that the existing mischief is the vital consideration to which attention must be directed, in order to ascertain the legislative mind. Therefore, the word "purpose" in this connection must be accorded a meaning which will enable the board to investigate not only the object of the proposed bond issue, but the conditions under which it is to be made, and the entire environment of the company with its antecedents, and the prospective opportunities it may encounter in view of its past history, to meet the financial demands that the proposed burden is likely to impose upon it.

It in nowise limits the effect and extent of such an inquiry to say, that the bonds in any instance are not intended to, and as a fact do not, increase the corporate indebtedness, but rather reduce it by one-half. Upon that basis it is conceivable that the criterion of value may be artificial, rather than real, and *non constat* that the refunding bonds to be issued to the holders of existing bonds, which bonds at the time of issue were concededly based upon a fictitious valuation, may under changed conditions, even at one-half the former valuation, still represent a value, in part at least, based upon sanguine, but nevertheless groundless hopes and expectations of a market in future, and a business atmosphere now concededly non-existent and therefore entirely problematical.

To this it may be answered that none but the present holders of the bonds can suffer from such chimerical hopes. But is it so? Who shall answer for the future of these bonds when they leave the hands of the present owners, and seek the open market for investment?

Such we conceive was the legislative inquiry when it reposed the power in and imposed the duty upon this administrative board to investigate, not only the legality, but practically the public policy and equity of a proposed bond issue, which in its far reaching effects concerns not alone this prosecutor and its bondholders, but the welfare of the investing

community, and the public conscience of the state, upon the approval of whose delegated agency the bonds will be offered for sale.

These considerations it was deemed advisable to entrust to this administrative board with practically a legislative injunction or mandate, that excepting in the absence of the delegated jurisdiction, or in the absence practically of evidence to support its ruling, the prerogative process of this court should not go to review it, but that its determination in such case shall become a finality.

Such is the *status* of this case as we perceive it; and in the light of those considerations it matters not whether upon a review of the testimony taken, we should be inclined to challenge the conclusion reached by this board, the real inquiry remains whether under such a clear legislative intent constituting the board in effect the depository of the conscience of the state, upon this subject, we can, where there is evidence to support their conclusion, substitute our judgment for that of the board.

That we cannot do so under the public policy underlying this legislation, and under the repeated adjudications of this court is manifest. *McGovern* v. *Board of Works,* 28 *Vroom* 580; *Colonial Trust Co.* v. *Scheffey (per curiam),* 69 *Atl. Rep.* 455.

For these reasons we have concluded to refuse the writ of *mandamus,* and to dismiss the writ of *certiorari.*