## ERIE RAILROAD COMPANY v. BOARD OF PUBLIC UTILITY COMMISSIONERS.

### Argued November 6, 1913—Decided February 24, 1914.

1. Upon *certiorari* to review an order of the public utility commissioners, we are not limited by section 38 of the act (*Pamph. L. 1911, p.* 388) in our right to set aside the order to cases where it clearly appears that there was no evidence before the board to support reasonably the order; that limitation is applicable to the procedure by petition only.

2. The voluntary practice of common carriers under less onerous conditions of furnishing water to passengers on all trains, does not of itself justify an order requiring the carriers to furnish water under more onerous conditions on those trains only whose scheduled run within the state is half an hour.

3. The Public Utility act does not justify merely arbitrary orders and anyone injuriously affected by such an order may justly complain even though the order is less onerous for him than it might properly have been.

4. The duty of the common carriers to supply passengers with water depends upon the practicability of the passengers obtaining water in case of need within a reasonable time, not on the time spent in traveling nor on the distance or zone traversed but on the frequency of stations, the season of the year, and the character of the travel on different trains.

5. The evidence in this case does not justify a hard and fast order to supply water on all trains with a scheduled run of half an hour.

On *certiorari.*

Before Justices SWAYZE and BERGEN.

For the prosecutor, *George S. Hobart* (*Collins & Corbin* and *Frederic B. Scott* on the brief).

For the defendant, *Frank H. Sommer.*

The opinion of the court was delivered by

SWAYZE, J. The question is the validity of an order made by the public utility commissioners requiring certain railroad companies to furnish drinking water on each passenger car "the schedule of which shows that one-half hour or more is required to run from the starting point * * * within the state to the last stop in the state."

Our jurisdiction by *certiorari* to review the orders of inferior tribunals cannot be taken away or diminished by the legislature. If the provision in section 38, that this court is given jurisdiction to review the order of the board and to set it aside when it clearly appears that there was no evidence before the board to support reasonably the order, were to be construed as limiting our jurisdiction, constitutional difficulties would arise. *Public Service Gas Co.* v. *Board of Public Utility Commissioners,* 55 *Vroom* 463. It was there held that no such construction was necessary and that on *certiorari* we would determine the case in the usual way according to the whole of the evidence.

This view had already been taken in *Pennsylvania Railroad* v. *Public Utility Commissioners,* 54 *Vroom* 67. In that case the court (at *p.* 70) accurately stated the question to be whether the order was justified by the proofs, not whether there was a total absence of evidence. This is the necessary rule under section 11 of the *Certiorari* act (*Comp. Stat., p.* 105), which makes it our duty in reviewing the proceedings of any special statutory tribunal to determine disputed questions of fact as well as of law. There is nothing either in the title or body of the act creating the public utility commission

to indicate that the legislature meant to repeal section 11 of the *Certiorari* act and to apply a different rule to the public utility commission from that applied to other special statutory tribunals. Nor is there any necessary repugnancy between the provisions of section 38 of the Public Utility act and section 11 of the *Certiorari* act. The former enactment deals with two methods of procedure, one by *certiorari* "in appropriate cases," the other by petition. The limitation of the right to set aside an order to cases where it clearly appears that there is no evidence is by the express language of the statute applicable to cases where the Supreme Court is "hereby given jurisdiction." The word "hereby" is inapplicable to our jurisdiction as the successor of the king's bench by writ of *certiorari,* confirmed to us by the constitution of 1844. The only jurisdiction given by the Public Utilities act is that by way of petition, and on that jurisdiction the legislature might impose limits. By holding that the limitation is applicable to the procedure by petition only, we avoid the constitutional difficulty and the equal difficulty of holding that section 11 of the *Certiorari* act is repealed by implication. On well-settled principles we ought to adopt a construction which has those advantages. It is, moreover, we think, quite clear from the statute that the legislature was solicitous to avoid any unconstitutional interference with the jurisdiction of the court. It was for that reason that our right of review by *certiorari* in appropriate cases was expressly reserved. We think it was reserved with all the attributes it then had.

We have thought it important to deal with this fundamental question. If, however, the order had been brought here by petition, we should think there was no evidence to support it reasonably, as the statute requires. The only evidence relied upon is "the long continued voluntary general practice of the carriers prior to July, 1911," and the inference of the board that the moving cause for the discontinuance of the practice was the enactment of the statute prohibiting the use of the common drinking cup, and the action of the state board of health, the public utility commissioners and this court with reference thereto. *Delaware, Lackawanna and Western Rail-*

*road Co.* v. *Public Utility Commissioners,* 54 *Vroom* 212. If we could infer that the voluntary practice of the carriers under the less onerous conditions prevailing prior to July, 1911, justified the inference that a continuance of that practice might reasonably be required under more onerous conditions, we should still have difficulty in seeing how the former practice could justify this precise order. It might, on the assumption we have made, justify an order requiring water on all trains; that would be a continuance of the former practice. But what is required in this case is to find the evidence justifying the board in drawing the line at trains whose schedule time is half an hour. The board, in its opinion, concedes that logically its reasoning would lead to a requirement of water on all trains, but says it is not inclined to press the matter to that point. This is equivalent to saying that the half-hour limit is merely arbitrary. No doubt the board thought it was making a concession to the carriers. Whether it was a concession or not is immaterial. The statute does not justify merely arbitrary orders, and anyone who is injuriously affected by such an order may justly complain; it is no answer to his complaint to say the order is not as bad for him as it might be. We recognize that some line must be drawn, and if we were now dealing with the question hereafter to be considered that arises under section 17b, whether the service furnished is adequate and proper, different considerations would need to be weighed. We are now dealing with the question whether there was evidence before the board to justify the precise order made. We think there was not, and if the question were here by petition under section 38, we should have to set aside the order.

The case, however, is here by *certiorari* and the consideration thereunder is somewhat broader. The board is empowered to require the carriers to furnish adequate and proper service. Section 16b. The duty of the carriers under section 18c is the correlative of this power. The question is whether, upon the whole evidence in the case, it is necessary to adequate and proper service that the railroads should furnish drinking water for half-hour runs.

It is not necessary to cite authorities to show that under some circumstances a requirement of drinking water would be entirely proper. Where a passenger train has a long run without a stop, it may be as much the duty of the carrier by land to supply drinking water as it is the duty of a carrier by sea, or as it is the duty of a carrier of cattle under our federal statute to permit the watering of cattle at certain intervals. The reason is that otherwise it might be impossible for the passenger to supply himself with a necessary of life. The impossibility, of course, is not an absolute impossibility, since it would be possible for the passenger to supply himself with bottled water at least for ordinary journeys, as is done in countries where customs differ from our own. What is contemplated is an impracticability, as traveling is done in this country. Such a rule has a basis in reason and rests upon the practicability of the passenger obtaining water in case of need within a reasonable time. This depends not on the time spent in travelling—the basis on which this order now before us was made—nor on the distance or zone traversed as the prosecutors contend, but rather on the frequency of stations, and on the season of the year. Trains on the subway in New York City make runs of more than an hour; many street cars have longer runs; the new route between Thirty-fourth street, in New York City, and Park Place, Newark, requires more than half an hour. Yet no water is provided by these carriers, nor are there even toilet accommodations on their cars. The reason is that the runs are not too long to preclude the passengers waiting ordinarily to the end of the run, and stations and stops are frequent enough to give opportunity to secure water in case of emergency. Ordinarily, it is probable that this would be so of railroad trains having only an hour's run. Such trains are probably urban or suburban trains with frequent stops. But neither time nor distance is always the proper criterion. Reason requires a different treatment for different trains, and at different seasons of the year. Water may be necessary on trains likely to carry ladies and children and not on trains carrying men to their business or their

work; and may be required in summer when not needed in winter. To sustain a hard and fast order like the present, the evidence ought to justify it as necessary under all circumstances. The evidence, however, is to the contrary. The chief inspector of the public utility commissioners testified that he wouldn't suppose it was necessary to furnish water on runs of half an hour, but he thought it necessary on runs of an hour; that he thought people could get along without water on an hour's run. The secretary of the state board of health, called by the public utility commission, testified that any person could go three or four hours without water at any time without affecting them physically. His only suggestion of the need of water on short runs was in very exceptional emergency cases, except, perhaps, he said in the case of babies on the train. The testimony of Dr. Arlitz, who was called for the railroad companies, was that there was no necessity even for children to drink water every fifteen or twenty minutes, and that if a child drank water in school every few minutes it would disorganize the discipline of the classroom; that in the hospitals he is connected with, patients under the control of a physician would not be allowed fluid every fifteen or twenty minutes, since that wouldn't give the stomach any rest at all. If to this medical testimony we add the fact that the legislatures of Massachusetts and New York have fixed an hour rather than half an hour as the dividing line, and the absence of any proof that half an hour is a proper dividing line, we cannot avoid the conclusion that the order in this case is not sustained by the evidence. It is therefore set aside.