NEW JERSEY SUBURBAN WATER COMPANY, PROSECUTOR-APPELLANT, v. THE BOARD OF PUBLIC UTILITY COMMISSIONERS ET AL., DEFENDANTS-RESPONDENTS.

Argued May 22, 1939—Decided September 22, 1939.

304

For the appellant, *George W. C. McCarter.*

For the respondents the Board of Public Utility Commissioners, *John A. Bernhard (Frank H. Sommer,* of counsel).

For the town of Harrison, *Michael J. Bruder.*

The opinion of the court was delivered by

PERSKIE, J. This is a water rate case. Two major questions require decision.

*First:* Did the Supreme Court, as it is claimed, erroneously exercise its supervisory power and fail fully to discharge its duty in affirming an order of our Board of Public Utility Commissioners under date of October 4th, 1937, fixing a rate of $99 per million gallons of water?

*Second:* Is the rate so fixed and determined, as it is claimed to be, unjust, unreasonable and confiscatory?

Appellant, New Jersey Suburban Water Company, hereafter referred to as prosecutor (now insolvent and operated by a receiver in Chancery), entered into a contract on September 15th, 1903, with the town of Harrison, hereafter referred to as respondent, because it is conceded that it is practically the only party affected, for the supply of its water. This contract fixed the rate at $82.50 per million gallons and was for a period of fifteen years with an additional ten-year option which respondent exercised.

On August 5th, 1924, the prosecutor and respondent extended or renewed their contract of September 15th, 1903, for a further period of fifteen years, so that, as lastly extended or renewed, it will expire in 1943. The rate, however, was fixed at $104.25 instead of $82.50 per million gallons.

On September 27th, 1928, the Board of Public Utility Commissioners, hereafter referred to as the Board, fixed the rate at $99 per million gallons, effective January 1st, 1929.

On April 11th, 1930, prosecutor petitioned the Board for an increase in rate to $108.50 per million gallons; Chancery litigation followed, and, on April 2d, 1936, prosecutor amended its petition seeking an increase in rate to $140 with

a surcharge of $14 and with an additional charge of $8.40 as against respondent alone. For reasons presently unimportant, these applications were dismissed without prejudice.

Thereafter, on April 30th, 1936, prosecutor again petitioned the Board this time seeking a rate of $151.91 per million gallons. In addition thereto, prosecutor separately petitioned the Board for a surcharge of $22 for a period of ten years to make up past deficiencies.

The Board conducted formal hearings on both petitions which, by consent, were heard together. Upon consideration of the proofs offered by the respective parties, the Board, on October 4th, 1937, denied prosecutor's petition for the surcharge; and, on the same day, the Board separately found and determined that the "existing rate of $99 per million gallons is not unjust or unreasonable under all the circumstances, and that, all the circumstances considered, $99 per million gallons is hereby determined, fixed and prescribed as the just and reasonable rate to be observed, imposed and followed by the company."

On application to review each determination, Mr. Justice Parker denied a writ to review the Board's denial of prosecutor's petition for the surcharge but allowed a writ to review the Board's order fixing the rate of $99 per million gallons.

The Supreme Court affirmed the Board and dismissed the writ. 122 N. J. L. 54; 4 Atl. Rep. (2d) 47. In so doing, it said, inter alia (at pp. 55, 56):

"A careful examination of the testimony satisfies us that the Board was justified in its conclusions. No useful purpose is to be served in reviewing the testimony. Suffice it to say, that in our opinion there was ample testimony to support its findings as a reasonable conclusion and, therefore, this court cannot substitute its judgment for that of the Board. * * *

"Having concluded that the testimony justified the Board in fixing the rate complained of, it follows that there is no merit in the allegation of confiscation of property without due process of law."

Prosecutor challenges the propriety of the determination thus made. That challenge is divided into two major parts.

The first part claims that the Supreme Court did not fully discharge its duty in the manner required by law when it affirmed the action of the Board. The second part claims that the rate of $99 per million gallons, as fixed and affirmed, is unreasonable, unjust and confiscatory.

1. In support of the first part of its challenge, prosecutor contends that the aforesaid quoted language of the Supreme Court fully justifies prosecutor's claim that the Supreme Court did not, as it was bound to do under the law in this type of case, make an independent finding of the facts in reaching its determination that the order of the Board was justified by the proofs. *Public Service Gas Co.* v. *Public Utility Board*, 84 *N. J. L.* 463; 87 *Atl. Rep.* 651, lastly affirmed, 87 *N. J. L.* 581; 92 *Atl. Rep.* 606; *Erie Railroad Co.* v. *Public Utility Board*, 85 *N. J. L.* 420; 89 *Atl. Rep.* 1001; *West Jersey and Seashore Railroad Co.* v. *Public Utility Board*, 87 *N. J. L.* 170 (at *p.* 178); 94 *Atl. Rep.* 57; *Erie Railroad Co.* v. *Public Utility Commissioners*, 89 *N. J. L.* 57 (at *p.* 68); 98 *Atl. Rep.* 13; *affirmed,* 90 *N. J. L.* 672; 103 *Atl. Rep.* 1052; *Hackensack Water Co.* v. *Public Utility Board*, 96 *N. J. L.* 184; 115 *Atl. Rep.* 528.

On the other hand, respondent claims that the Supreme Court did make an independent finding of the facts and correctly applied the law thereto. In addition, relying on the very cases cited by prosecutor and others presently cited, respondent claims that when conflicting proofs support the conclusion that the action of the Board is not arbitrary but is based upon legal proofs, the Supreme Court does not substitute its judgment for the judgment of the Board. For the Board, in finding a rate, acts as a legislative agency in the performance of a legislative duty. *Cf. Inter-State Tel. Co.* v. *Public Utility Board*, 84 *N. J. L.* 184; 86 *Atl. Rep.* 363; *Plainfield Union Water Co.* v. *Board of Public Utility Commissioners*, 6 *N. J. Mis. R.* 267; 140 *Atl. Rep.* 785; *West Jersey and Seashore Railroad Co.* v. *Board of Public Utility Commissioners*, 8 *N. J. Mis. R.* 212; 149 *Atl. Rep.* 269.

The foregoing principles of law are, under the issues

involved, in harmony with each other and with those pronounced by the Supreme Court of the United States. (See cases collated in *St. Joseph Stock Yards* v. *United States,* 298 *U. S.* 38-94 (at *p.* *51); 80 *L. Ed.* 1033 (at *p.* 1041). But when, as here, the claim is made that the rate as found, is confiscatory, *i. e.,* prosecutor is deprived of its property without due process of law contrary to the Fourteenth Amendment of our Federal Constitution, then again, both by our decisions (see cases first cited for prosecutor), and by the decisions of our Federal Supreme Court, the requirements of due process can be satisfied only if there is the right of appeal or review to a court with jurisdiction to make an independent finding both of the facts and the law. *Cf. Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 *U. S.* 287; 64 *L. Ed.* 908; *St. Joseph Stock Yards* v. *United States, supra.*

With these principles in mind, it is argued that the necessary inference to be drawn from the quoted language of the opinion of our Supreme Court is that the Supreme Court did make the same factual finding that the Board made. That may be so. But whether it did or did not make the required factual finding is not altogether free from debate. We regard it unwise to consider and determine a constitutional question upon such a state of the record.

We could, of course, remand the cause to the Supreme Court to make a definite finding. But we have frequently acknowledged our power to pass upon the merits in fairly comparable circumstances (*Jordan* v. *Borough of Dumont,* 105 *N. J. L.* 197, (and cases collated at *p.* 198); 143 *Atl. Rep.* 843; *Harman* v. *Reed,* 108 *N. J. L.* 191; 155 *Atl. Rep.* 145), and have at times exercised that power when we deemed it desirable to do so. *Smith* v. *Carty,* 120 *N. J. L.* 335 (at *p.* 340); 199 *Atl. Rep.* 12. Since all proofs are before us, and since we are of the opinion that the protracted litigation of the issues here involved should be ended, we choose to adopt the course we have followed in *Smith* v. *Carty, supra,* and shall consider and determine this cause upon the merits.

2. This brings us to the second part of prosecutor's challenge. It presents the pith of the issue. Is the rate, $99

per million gallons, unreasonable, unjust and confiscatory? Does it deprive prosecutor of its property, as it claims, without due process of law contrary to the Fourteenth Amendment of our Federal Constitution?

The Board found that the fair reproductive value of prosecutor's property, used and useful, and with due regard to the reasonable value of the services rendered, was $130,180. From that sum it deducted $83,315 as the estimated depreciation of the property, and to the balance of $46,865 it added $4,686 for going value, making a net value of $51,551. The board allowed a rate of six and three-quarters per cent. above the reasonable and fixed charges and, as already stated, the Supreme Court affirmed the Board.

Prosecutor challenges the propriety of the results reached both by the Board and the Supreme Court. The argument in support of its challenge is separately captioned under the following headings: "Rate base, depreciation, going concern, operating expense, fair return, comparative rates, confiscation, and what the court should do." We shall consider each in the order stated.

*Rate Base.* Prosecutor's property consists of a thirty-inch riveted steel main, five-sixteenths of an inch thick. It begins at a point where it connects with the main of the Passaic Valley Water Commission located at Belleville and Kearny avenues, Kearny, New Jersey, and runs thence southward from or along Kearny avenue a distance of about two and one-half miles to a point just beyond the northerly limit of Harrison. Special facilities are provided to carry this main over two railroad crossings; one is the "Greenwood Lake Railroad Division of the Erie" and the other is the "Erie Railroad at the northerly limit of Harrison."

Prosecutor uses this main to transport water which it buys from the Passaic Valley Water Commission at $78 per million gallons and sells for $99 per million gallons, or at a gross difference of $21 per million gallons.

From the record submitted we learn that in its earlier years prosecutor had four major customers, viz., the town of Kearny, with a population of about forty thousand, the bor-

ough of East Newark, with a population of about four thousand, the town of Harrison, with a population of about fifteen thousand, and the East Newark Realty Company (formerly Clark Thread Company).

In 1929, for example, prosecutor sold to Kearny, East Newark and Clark Thread Company one billion, one hundred and fifty-six million nine hundred and seventy-two thousand five hundred gallons of water, and it sold to Harrison one billion two million five hundred and forty-eight thousand gallons of water, or a total of two billion one hundred and fifty-nine million five hundred twenty thousand five hundred gallons of water.

Gradually prosecutor lost Kearny and East Newark as customers. Prosecutor concedes that the East Newark Realty Company is not under any contract to buy water from prosecutor and that it is a very small customer, so small that it is practically negligible. Thus· prosecutor has virtually one remaining customer, namely, respondent, the town of Harrison, whose contract, as we already know, expires in 1943.

We learn more from the record. The proofs indicate that there is little, if any, likelihood of prosecutor being able to recapture either Kearny or East Newark as customers; they having made other arrangements for their supply of water; that there is little, if any, likelihood of prosecutor obtaining other customers; and that there is nothing presently to indicate whether respondent shall or shall not continue as its customer after 1943.

In this posture of the proofs, which proofs are free from any substantial dispute, each side offered expert testimony as to the present value of prosecutor's property on the basis of cost of reproduction. Without attempting to detail the many objections which each side raises as to the probative value of the testimony so produced by the other side, it will suffice, in our view of the cause, if we merely state the results reached by the respective experts.

Mr. Vermeule, for prosecutor, fixed the fair value at $271,553. Prosecutor concedes that $260 should be deducted from this amount for two valves no longer used or useful, and

a possible further reduction of $2,942.59 arising out of the dispute as to the actual length of the main.

For respondents the following fair values were fixed: Mr. Potts, $163,292; Mr. Cleveland, $174,383, and Mr. Williams, $163,292.

In light, however, of prosecutor's present and prospective business status and in light of the value of the services which it rendered, respondents' experts concluded that prosecutor's main was altogether too large. For a period of about two months prosecutor used a twelve-inch temporary by-pass pipe across the bridge (*Exhibit P-4*) which pipe was sufficient to supply the water needs of "Harrison, East Newark and Clark Thread Works." Potts and Williams testified (respondent characterized their testimony as the "Potts and Williams theory") that only fifty per cent. of prosecutor's main was necessarily useful for the services rendered; that by the use of a small main plus increased pressure, claimed to be available by turning in the Great Notch reservoir which formerly served prosecutor's line and is still attached thereto, double the daily ordinary and extraordinary needs of respondent would be fully satisfied; and that because of these circumstances respondent's experts reduced their appraisement fifty per cent. For example, Mr. Potts reduced the fair valuation of prosecutor's property, used and useful, to $81,646.

Prosecutor, on the other hand, contends that the "Potts and Williams theory" is "untenable in law" and "unfounded in fact." That contention, generally stated, is based upon the premise that the main is not too large; that it has no right to exact from the Passaic Valley Water Commission the right to turn in the Great Notch reservoir; and that to do so would be neither practical nor safe. Prosecutor, moreover, stoutly contends that there is no basis, under the proofs, to support the Board's valuation of $130,180. In support of that contention prosecutor especially emphasizes the fact that the Board in 1929 placed the fair value upon the same plant of $197,000 after deducting $20,000 for depreciation and including going concern value.

The rationale of the Board's action is best gathered from its decision wherein it said:

"The testimony also shows that the present plant capacity is greatly in excess of the requirements of the town of Harrison. The Board recognizes that it cannot alone determine the true and fair value of the property used and useful by a comparison with a similar plant. Nevertheless, if a company were to seek rates as a going concern on the basis of an initially overbuilt plant, this commission would be obliged to only allow a rate which would give a fair return alone upon the value of the property in so far as it was used and useful. The value of the overbuilding; the excess over the value of the property which was used and useful would not be included in the rate base. It therefore follows that when a plant, by reason of the changed conditions and novel circumstances presented in this case, becomes analogous to an overbuilt plant, such excess in property not used and useful cannot be included in the estimate of a rate base."

"In 1929 this Board fixed the value of the company's property used and useful at $197,000. At that time the company served various municipalities and private consumers. To-day the company has virtually one customer, without firm assurance of the long retention of that customer, and it therefore becomes the duty of the Board to determine the value of the property used and useful in relation to the present service rendered and that which might reasonably be rendered in the reasonable future. To obtain this objective the Board has calculated that the value of the property now used and useful is $130,180, * * *." (*Cf. San Diego Land and Town Co.* v. *Jasper,* 189 *U. S.* 439, 447; 47 *L. Ed.* 892 (at *p.* 896); *Long Branch Commission* v. *Tintern Manor Water Co.,* 70 *N. J. Eq.* 71 (at *p.* 78); 62 *Atl. Rep.* 474 (at *p.* 477).

Neither industry of capable counsel, nor that of the court, has produced an adjudication in an altogether like situation. This is not the case of a mistaken judgment in building too large a plant. *Cf. Elizabeth* v. *Public Utility Commissioners,* 99 *N. J. L.* 496 (at *p.* 498); 123 *Atl. Rep.* 358. Here the main was built sufficiently large to allow prosecutor to carry out its contracts to supply the needs of its earlier customers. Now it finds itself with altogether too large a

plant on its hands, with only one customer, and with little, if any, prospect for future betterment of its unusual and unhealthy business status.

The fallacy, as we see it, with prosecutor's contention is that it, in effect, makes the cost of the reproduction of its plant, irrespective of the circumstances exhibited, the conclusive test of determining its present fair value. That is not the law. Reproduction cost, like historic costs and actual costs, "is a relevant fact requiring appropriate consideration," but does not furnish "an exclusive test." The weight to be given to reproduction costs "is to be determined in light of the facts of the particular case." *Cf. Los Angeles G. & E. Corp.* v. *Railroad Comm.*, 289 *U. S.* 287 (at *pp.* 307, 308); 77 *L. Ed.* 1180 (at *pp.* 1193, 1194). Very aptly has it been held that "value depends upon use and is measured, or at least significantly indicated, by the profitableness of present and prospective services rendered that are just and reasonable as between the owner of and those served by the property." *Denver Union Stockyards Co.* v. *United States,* 304 *U. S.* 470 (at *p.* 479); 82 *L. Ed.* 1469 (at *p.* 1478), and cases there cited.

We find it unnecessary to decide whether the board was right in its reasoning that the present value of prosecutor's plant was to be determined upon the analogous basis of an initially overbuilt plant; we are called upon to decide only whether the Board reached a proper, a right result. *Cf. Central Railroad Company of New Jersey* v. *State Tax Department,* 112 *N. J. L.* 5 (at *p.* 16); 169 *Atl. Rep.* 489; *certiorari* refused by United States Supreme Court, 293 *U. S.* 568; 79 *L. Ed.* 667.

With this objective in mind, we are satisfied, notwithstanding the fact that prosecutor was necessarily obliged to use its main, double the necessary size, to serve respondent, that prosecutor is entitled only to a fair and just return based upon the fair valuation of that main, with due regard to its excessive size and with due regard to the fair and just value of the services rendered. A valuation so reached, we think, is fair and just both to the owners of and those served by, the

property. *Denver Union Stockyards Co.* v. *United States, supra; Public Service Gas Co.* v. *Board of Public Utility Commissioners, supra.*

Thus, with due regard to the excessive size of prosecutor's property, with due regard to the necessary use made thereof (and in that sense used and useful), and with due regard to that which is fair and just, as between prosecutor and respondent, we find, as a fact, that the fair valuation of prosecutor's property is the sum fixed by the Board, namely, $130,180.

*Depreciation.* The Board calculated the item of depreciation at two per cent. per annum for thirty-two years and reached a total depreciation of $83,315. This amount was reached upon the basis of a fifty-year life for the property and the Board indicated that its determined amount was "under the amount which [prosecutor] itself had depreciated the property upon its books [$138,012.90] * * *." Prosecutor denies that the item of $138,012.90 set up in its report, under "amortization or retirement reserve" represents an existing fund set up for depreciation. But however characterized, prosecutor concedes that it charged $33,000 to amortization but never in fact set it up; it admits that it earned this amount but paid it out in dividends. Prosecutor further claims, without supporting authority, that the item of $138,012.90 was set up at the direction of federal tax authorities, and that it is non-existent; it is purely mythical. Be that as it may, we do not find it necessary further to labor this point, or the point that prosecutor's present plight is largely due to the manner in which it manipulated and diverted its funds. The question is: do the proofs support the Board's determination? We think they do.

Now, good, common judgment compels the conclusion that "a water plant with its additions, begins to depreciate in value from the moment of its use." *Knoxville* v. *Knoxville Water Co.,* 212 *U. S.* 1 (at *p.* 13); 54 *L. Ed.* 371 (at *p.* 380). Especially is this so when, as here, practically all the pipe is buried in the ground with the exception of a short distance for which it is above the ground but submitted to

locomotive gases. The proofs, moreover, disclose that twenty-two million gallons of water leaked out of the main in a year and that prosecutor was obliged to, and did, expend relatively substantial sums of money each year to repair leaks. For example, it spent $3,151.26 in 1929; $1,611.83 in 1930, and $2,337.25 in 1931. Additionally, experts for respondent testified that in the engineering profession, fifty years is considered as the average length of life for a pipe line of the character here involved. The average length of life thus reached is not purely theoretical; it is based, "on experience—practice—and study  *  *  *."

It is, of course, true that the testimony of competent valuation engineers, who examine the property and make estimates in respect to its condition, is to be preferred to mere calculations based on averages and assumed probabilities. *McCardle* v. *Indianapolis Water Co.*, 272 *U. S.* 400 (at *p.* 416); 71 *L. Ed.* 315 (at *p.* 327). But the testimony of prosecutor's expert does not come within the stated rule.

He examined the inside of the pipe at the Erie Railroad in 1928, at the Greenwood Railroad in 1932, and at several cuts into the pipe made at points where it rested in the earth trench, beyond the above two stated places. Such examinations were, indeed, limited and spotty in character. His testimony, moreover, that he did "not think that any deductions should be made for depreciation, deterioration  *  *  *" lacks persuasion; he, in fact, did make an allowance of $20,000 for depreciation.

We are satisfied that the deduction of $83,315 for depreciation is fully supported by the proofs. We so find.

*Going Concern Value.* Prosecutor concedes that "going concern value" is not really involved in this case. In view of that concession, this item requires no discussion.

*Operating Expenses.* Prosecutor complains on but two scores.

The first complaint concerns the item of taxation. The Board concluded "that municipal taxes properly chargeable are only those taxes upon property which is used and useful," and accordingly reduced the item of taxes in the operating

expenses "in the ratio that the assessment on the property used and useful bears to the total assessment." In so doing, we hold, the Board was entirely correct; it exercised good judgment. The consuming public should not be forced to shoulder taxes on any property other than that which is used for or useful to it. If the taxes as assessed are, as contended, erroneously assessed, prosecutor has its remedy.

The second complaint is that the Board made no allowance for amortization. Under the proofs of the case at bar, what has already been written under the heading of "Depreciation" is dispositive of this point. In the final analysis, as already observed, prosecutor, under all circumstances, is only entitled to a fair and just compensation for the services which it renders.

*Fair Return.* Prosecutor insists that "no percentage less than eight per cent. will be adequate." We find no merit to this insistence. In light of all the circumstances exhibited in this cause, we find that the rate of six and three-quarters per cent. is fair and just as between prosecutor and respondent.

*Comparative Rates.* The Board held that "* * * it must, under the circumstances of this case, take cognizance of existing comparative rates allowed for the sale of water in adjacent communities, and while it bears no absolutely controlling relation to the value of the service rendered by this company, it is an *indicia* of what may be termed reasonable value of the services and on the average the Board finds no rate existing in excess of $99 per million gallons."

The Board, under the circumstances, properly considered comparative rates in localities similarly situated. *Cf. Blue-filed W. W. and Improv. Co.* v. *Public Service Com.,* 262 *U. S.* 679 (at *p.* 690); 67 *L. Ed.* 1176 (at *p.* 1182); *Public Service Gas Co.* v. *Board of Public Utility Board, supra* (at *p.* 475 in 84 *N. J. L.* and at *p.* 656 in 87 *Atl. Rep.*).

*Confiscation.* It is interesting to observe, for whatever value, if any, it may have, that prosecutor carried its entire plant at the book value of $167,541.13, without deduction for depreciation; that as of January 1st, 1935, it set up the sum of $134,102.90 under the heading of amortization or

retirement reserve. By so doing, prosecutor's books show a depreciated book value of all its property of $33,438.53 as against the depreciated value of $46,865 fixed by the Board.

But be that as it may, having found that the rate fixed by the Board was fair and just, it necessarily follows, and we so hold, that prosecutor has failed satisfactorily to establish, as it was obliged to establish, that the rate fixed by the Board and affirmed by the Supreme Court, infringes constitutional immunities.

*What the Court Should Do.* Judgment is affirmed, with costs.

*For affirmance*—THE CHANCELLOR, PARKER, BODINE, HEHER, PERSKIE, HETFIELD, DEAR, WELLS, WOLFSKEIL, RAFFERTY, HAGUE, JJ. 11.

*For reversal*—None.