IN THE MATTER OF THE PETITION OF PUBLIC SERVICE
COORDINATED TRANSPORT AND PUBLIC SERVICE IN-
TERSTATE TRANSPORTATION COMPANY FOR AN AP-
PROVAL OF AN INCREASE IN THE RATES OF FARE.

PUBLIC SERVICE COORDINATED TRANSPORT AND PUB-
LIC SERVICE INTERSTATE TRANSPORTATION COM-
PANY, PETITIONERS-RESPONDENTS, v. STATE OF NEW
JERSEY, APPELLANT.

Argued May 29, 1950—Decided June 27, 1950—Rehearing
Denied July 11, 1950.

*Mr. Benjamin C. Van Tine,* Deputy Attorney General, argued the cause for the appellant (*Mr. Theodore D. Parsons,* Attorney General).

*Mr. William H. Speer* argued the cause for the respondents (*Mr. Winslow B. Ingham,* on the brief; *Messrs. William H. Speer* and *William H. Blake,* attorneys).

*Mr. George M. Eichler* argued the cause for Hill Bus Company, *et al.,* intervenors.

*Mr. James F. X. O'Brien* argued the cause for Consolidated Bus Lines, Inc., *et al.,* intervenors.

The opinion of the court was delivered by

VANDERBILT, C. J. The State, by the Attorney General, appeals from a decision and order of the Board of Public Utility Commissioners entered on December 14, 1949, dismissing an order to show cause issued by the Board and directed to Public Service Coordinated Transport and Public Service Interstate Transportation Company, why the rate of fare approved by an order of the Board dated May 5, 1948, should not be reduced or adjusted. The appeal was taken to the Appellate Division of the Superior Court, but while pending there was certified by this Court on the petition of the State.

## I.

The order here appealed from was the culmination of a proceeding commenced on October 30, 1947, when Public Service Coordinated Transport and Public Service Interstate Transportation Company filed a petition with the Board for approval of an increase in the basic rate of fare for trolley and bus service from five to seven cents, so as to offset an anticipated increase in operating costs resulting from a 16½c an hour wage increase awarded their employees on August 14, 1947, by a board of arbitration appointed by the Governor of the State of New Jersey pursuant to statute. Notice of this application and the basis thereof was duly given to the public and hearings thereon were held by the Board in January and February, 1948, at which a number of municipalities, labor organizations, independent bus lines, and other interested groups and individuals appeared.

From the outset of these hearings it was made clear that the companies were not undertaking a full-fledged rate case, but were seeking an increase only to compensate for the increased costs of labor occasioned by the arbitration award. The companies proceeded on the theory of *O'Brien v. Board of Public Utility Commissioners*, 92 *N. J. L.* 44 (*Sup. Ct.* 1918); affirmed, 92 *N. J. L.* 587 (*E. & A.* 1919), wherein it was held that the Board was empowered to grant emergency

relief to a utility by way of a rate increase without the necessity of redetermining the rate base. To proceed on this theory necessarily required the Board to assume and the companies to admit that the existing rate was fair and reasonable, prior to the wage increase, and supported by an adequate rate base. In thus seeking to avoid the delays incident to the establishment of an increased rate by the usual procedure, the companies called upon the Board to give temporary emergency relief by putting in the seven-cent fare at once "to test out what it will produce."

Proceeding on this theory the companies introduced evidence to support the allegations made in their petition that the wage increase granted by the board of arbitration would increase their total annual operating costs by an estimated $3,703,406; that the net increased cost, after deducting an allowance for income taxes, would amount to $2,989,626 annually; and that an increase in fare from five to seven cents, taking into consideration an anticipated decrease in business resulting from passenger resistance to the higher fare and an expected general business recession, would produce a gross annual increase in revenue of $4,482,878, which after allowances for the federal income tax and the five per cent state tax on passenger revenues, would net the companies an increase annually of $3,348,957. The State and other interested parties acceded to the theory on which the increase was sought, but objected to and examined the companies' witnesses on the need for a two-cent increase (it being their contention that a six-cent fare would be adequate) and on the propriety of making the increase effective for all the routes of both companies without regard for the profit and loss figures of each company and their individual lines.

By the companies' own admission a seven-cent fare would produce approximately $400,000 more than enough to offset the increase in labor costs. However, if income tax computations are excluded. as they properly should be where a raise in rate is sought only to offset an increase in operating costs, since only that income in excess of the amount needed to

compensate for the increased costs would be subject to tax, and if the companies' revised estimate of the increase in labor costs, which totaled $3,562,354, be considered instead of their original estimate, it is apparent that the seven-cent fare could be expected to produce annually about $700,000 more than enough to offset the wage increase.

Notwithstanding these obvious facts, on the urging of the companies "to put a rate into effect and see what happens," on May 5, 1948, the Board rendered its decision in which it found the requested rate increase to be justified and reasonable and ordered the seven-cent fare into effect. In this order, however, the Board specifically provided as follows:

"* * * The results that the fares herein allowed will produce can only be known after a reasonable period of actual experience with them.

"The Board, therefore, will retain jurisdiction in this matter for the purpose of investigating and giving further consideration to the effect of the proposed new fares on the revenues and expenses of the applicants, as well as the effect of increase in fares on riding habits under the circumstances in the case. If it develops that under the new conditions the effect upon customers is such that a revision of the proposed fares herein permitted to go into effect is required, the Board will on its own motion institute such revision." * * *

"This order is limited by and subject to the condition that the applicants file with the Board before the effective date of the revised schedules of fares, an acceptance, in writing, of this Order and its conditions, and incorporate therein a stipulation that the Board shall retain full and complete jurisdiction over the applicants herein, with power and authority, upon notice and hearing or on agreement, to modify, amend or alter this Decision and Order as the results of operation thereunder may warrant."

After six months' operation with the seven-cent fare it became apparent that greater revenues were being produced than had been anticipated and accordingly on February 24, 1949, the Board, exercising the control it had retained over the proceedings, ordered the companies to show cause why the fares or rates of fare should not be reduced or adjusted. Hearings on this order were held in March, April and June, 1949, the same being conducted without notice to the public other

than that which had been given at the time of the filing of the companies' petition in 1947. At these hearings various independent bus companies petitioned the Board for permission to intervene for the purpose of submitting proof in support of their contention that if Public Service Companies' fare were reduced, they, the independents, would be unable to survive, since operation at fares below seven cents was financially impossible and since operation at a seven-cent fare if the Public Service Companies charged a lower rate would be competitive suicide.

At these hearings the companies did not seek to justify the seven-cent fare as necessary to meet the increased wage cost, the theory on which the increased fare had originally been sought and granted, but to justify it on the theory that it merely provided a fair return on a proper rate base. Thus without notice to the riding public and other interested persons the entire nature of the proceeding was changed. The reason for this change is obvious, for the actual reported net income of the companies for the first twelve months' operation under the rate increase was $2,984,963, as compared with the estimate made at the time of the previous hearing in 1948 that the net income for the first year's operation under the new rate would be $1,238,114. The companies could thus not even hope to justify as reasonable on their original theory a rate of fare which had resulted in more than doubling their net income. The State and the municipalities that appeared objected to this change in the basis of the proceeding adopted by the applicants and took the position that the seven-cent fare was producing excessive revenues and that a six-cent fare should be instituted for an experimental period.

To support their new contention that the seven-cent fare produced no more than a reasonable return on an adequate rate base, the companies called one witness, introduced five exhibits, and then rested their case. This was not the complicated, expensive and time-consuming procedure of proving a rate base which the companies had sought to avoid at the time of the filing of their application for an increase in rates.

A single one-page exhibit entitled "Development of estimated rate base as at December 31, 1948," was virtually the only evidence offered by the companies to support their contention for a rate base of $61,404,587. After disallowance and adjustment of certain items, the most significant of which were the elimination of $10,574,912 labeled as "Intangibles attaching to buses the operating authority for which stems from street car franchises" and a $3,000,000 allowance for cash working capital, the Board arrived at a rate base of $47,127,365. Included in this figure was an item of $17,233,538 representing the cost of intangible property related to the organization and acquisition of the various auto bus properties now included in the companies' state-wide system. These intangibles had been rejected by the Securities and Exchange Commission in the exercise of its jurisdiction over the financial structure of the companies and had been ordered eliminated from the companies' books by charging it off to surplus. The Board, however, considered that these acquisitions were necessary in the integration of the auto bus transportation system and served the public through improved and extended service and said: "The record shows that the expenditures represented by this claimed item were the result of arm's length bargaining, continue to represent functional value, and have not been recouped by the investors." By relating this rate base of $47,127,365 to an adjusted operating income of $3,827,054, the Board found the rate of return produced to be 8.12 per cent, and that the return on the companies' stock for the first full twelve months of operation under the seven-cent fare was 9.41 per cent on a stated value of $60 per share. The Board concluded, however, that in view of the risks involved in local transportation, the applicants' descending trend of revenue, the need for additional capital for modernization and continued maintenance of safe and adequate service, "the present fares are just and reasonable and do not now and will not in the foreseeable future yield more than a fair return." The Board accordingly on December 14, 1949, ordered that the proceedings initiated by

the order to show cause be terminated. It is from this Decision and Order that the present appeal was taken.

## II.

Before discussing the real issue before the Court on this appeal there are three procedural questions which must be determined.

1. The Public Service Companies contend that the Attorney General may not as a matter of law maintain the appeal in the instant case. It is argued that, although the Attorney General has limited power to appear on behalf of or as counsel for the Board, he has never had the right to appear on behalf of the people in lieu of the Board in matters wherein it is acting in its capacity as an agent of the Legislature. The prerogative of representing the public in utility matters, it is urged, is bestowed upon the Board itself, citing *Board of Public Utility Commissioners v. Sheldon*, 95 *N. J. Eq.* 408 (*Ch.* 1924). The instant case, it is stated, is not an appeal by the State against the Public Service Companies, but an action by the Attorney General against the Board itself, in which he arrogantly substitutes his own judgment for that of the regularly constituted state agency and attempts to usurp the function granted it by the Legislature. By *R. S.* 52 :17A–4(e) his sole power, it is claimed, is to represent the Board, and others,. "in all matters other than those requiring the performance of administrative functions entailing the enforcement, prosecution and hearing of issues as imposed by law upon them." It is also asserted that the action of the Attorney General herein is particularly anomalous in that he, or his deputies, actually appeared of record on behalf of the Board at the hearings. Indeed, the Public Service Companies would have it appear that the Attorney General is a Hydra which at one and the same time defends and attacks the various agencies of the State.

This concept of the positions of the Attorney General and the Board on this appeal is a mistaken one. Clearly the

Board is not here under attack; the appeal is in no way directed against it. As the court stated in *Public Service Interstate Transportation Company v. Board of Public Utility Commissions,* 129 *N. J. L.* 94, 95 (*E. & A.* 1942), wherein the Board itself sought to take an appeal:

"We are clear that it has no status as such. It is in no sense a party whose interests are adversely affected, but obviously a subordinate statutory tribunal which made a legal decision reviewable by *certiorari* like those of other special statutory tribunals."

The Board is not a party to this proceeding and its prerogatives are not being usurped by the Attorney General. To hold otherwise would be tantamount to holding that a trial court is a party to an appeal from a judgment entered therein, or that the Legislature is a party to a proceeding in which the constitutionality of a statute is contested.

It does not require an acute sense of discrimination to distinguish between the Board itself and a determination of the Board. The Board is a creature of statute operating legitimately only within definite statutory limitations. It would be an odd situation indeed if the people, through the executive, were unable to enforce the legislative restrictions placed upon its functions. The Attorney General has traditionally been recognized as the defender of the public interest. This power is an attribute of his office, bestowed by the common law, which has not been taken away by legislative enactment. The Legislature makes laws in the public interest, but their enforcement is a matter for the Governor, who, pursuant to the authority vested in him by Article V, Section I, paragraph 11 of the Constitution of 1947, has directed the Attorney General to take this appeal in the name of the State. It cannot be seriously disputed that the public has an interest which is here in need of adequate representation. The record discloses that the Public Service Companies in 1947 operated 3,408 buses and 171 street cars to transport 665,000,000 passengers 116,000,000 miles. Their routes are located in 20 of the State's 21 counties and serve some 375 municipalities having

a total population, according to the 1940 census, of 3,812,750, or almost 92 per cent of the total population of the State, and ranging in size from Newark, the largest with a population of 430,000, to Tavistock in Camden County, with a population of 13. These two Public Service Companies provide 60 per cent of this State's local bus and trolley service, as against the 40 per cent being furnished by the scores of independent companies. It would be futile to argue that the people of New Jersey do not have an interest in this proceeding. The interest of the citizens of the State is the interest of the State itself, and by *R. S.* 52:17A–4(g) the Attorney General is charged to "Attend generally to all legal matters in which the State * * * is a party or in which its rights or interests are involved." As was said in *Attorney General v. Delaware and Bound Brook Railroad Company*, 27 *N. J. Eq.* 631, 633 (*E. & A.* 1876):

"The State is not left without redress in its own courts because no private citizen chooses to encounter the difficulty of defending it, but has appointed this high public officer, on whom it has cast the responsibility and to whom, therefore, it has given the right of appearing in its behalf and invoking the judgment of the courts on such questions of public moment."

The challenge to the Attorney General's authority to take this appeal is thus not well made.

2. The next procedural question to be considered *in limine* is the status of the independent operators whose petition to participate in the hearings on the order to show cause was granted by the Board, and who contend that they are proper and necessary parties to this proceeding, that the failure of the Attorney General to properly serve them on the appeal is fatal, and that the appeal should accordingly be dismissed. There can be little doubt that these independent bus companies, many of whom compete directly with the Public Service Companies in the same municipalities and over the same routes, have a vital interest in this proceeding and will be greatly affected by its outcome. This being so, they unquestionably have a right to appear before the Board and present

their views. Their position is akin to that of the various municipalities, employees groups, citizens and others who, because of their particular interest in the rates being established, put in an appearance at the hearings. They are not, however, parties to the proceeding and there is nothing in the record to indicate that they are to be considered as such. Indeed their very petition for permission to intervene did not even request that they be made parties, but stated:

> "This petition is brought to permit all of the 'independent' bus companies, or as many thereof as may desire, to participate in these proceedings for the purpose of submitting proof in support of the above assertions and contentions."

By granting this petition the Board neither acquired nor assumed jurisdiction over the independent bus companies, and the decisions and orders of the Board entered herein are not in any respect binding upon them. Proceedings before the numerous state and municipal agencies, boards and commissions would be rendered chaotic if all persons who were permitted to appear became parties to the proceedings merely because the orders to be issued or the rules to be made would have an effect upon them, financially or otherwise. The interest of the independent bus companies is probably sufficient, though the question is not now before the Court, to take an appeal from a decision or order of the Board which they consider to be arbitrary and unreasonable or otherwise erroneous and unlawful, just as the municipalities and citizens of the State, individually or collectively, and the State, on their behalf by the Attorney General, have the right to pursue an appeal. But when such an appeal is taken the appealing party is not thereby burdened with the precarious task of serving notice, appendix and briefs upon all and sundry who may have expressed an interest at the hearings. Such would place an unreasonable requirement upon them and one which is neither contemplated nor required by *Rule* 3:81–8. The argument of the independent companies that they are proper **parties to this proceeding must therefore be considered to be**

without merit and their motion to dismiss the appeal for lack of proper notice and service is accordingly denied.

3. The final procedural question raised is whether or not this appeal presents to the Court for review the action of the Board in granting the rate increase from five to seven cents; or, stated in other words, since the filing of the petition by the companies on October 30, 1947, has there been but a single case culminating in the Decision and Order of December 14, 1949; or have there been two cases, one commenced by the companies' petition and terminated by the Decision and Order of May 5, 1948, from which the time to appeal has expired, and another commenced on February 24, 1949, with the issuance of the order to show cause and ending in the Decision and Order of December 14, 1949? We are of the opinion that there has been but one case or proceeding and that this appeal presents for review the question of whether or not the increase in fare from five to seven cents was just and reasonable. A number of facts inescapably lead to this conclusion.

On October 30, 1947, the companies filed their petition for the change in rate from five to seven cents to cover their anticipated increased labor costs and the public was duly noticed as to the filing of the application, the reason for the same, and the hearing dates, and the case was assigned Public Service Docket No. 3467. Throughout the course of the hearings the companies urged the Board to put a rate in effect and try it out, that quick emergency relief was necessary, and that any needed adjustments could be made at a later date. Accordingly the order of May 5, 1948, was entered, in which order the Board specifically retained jurisdiction in the matter and provided that the order was conditioned upon the companies indicating their acceptance thereof in writing. This action by the Board is authorized by, and only by R. S. 48:2–21.1 which reads:

"The board may, during the pendency of any hearing instituted by it, on its own initiative or on complaint, in which the approval or fixing of just and reasonable individual rates * * * is an issue, or at any other time, negotiate and agree with any public utility for

an adjustment of the individual rates * * * for any product or service supplied or rendered by such public utility. Such adjustment may be for, or without, a specified limit of time. In no event shall any such adjustment be regarded as contractual. Such adjustment shall at all times be subject to change through the proceedings provided for by this chapter, or through negotiation and agreement under this section. *The board as a part of any such negotiation, and adjustment shall provide for the continuance, supervision or other disposition of any hearing of the character aforesaid then pending.*" (Italics supplied.)

When the operating results of the Public Service Companies under the increased rates of fare established under the quoted statutory authority indicated that the matter should be reviewed, the Board reopened the proceeding, as it had specifically reserved the right to do, and issued its order to show cause, directed to the companies, why the rates should not be reduced or adjusted. To this order the Board significantly affixed the same Docket No. 3467 as had been previously assigned to the Public Service Companies' original petition. No additional notice was given to the public or the municipalities to advise them of this rehearing, as would have been mandatory had this been a new case or proceeding rather than merely a continuation of the original one. Early on the first day of the rehearing on the order to show cause, when the companies' counsel began to assign new numbers to exhibits, the following transpired:

"Mr. Harrison: I think you better call it R-2, not to confuse it with the original numbers in the proceeding of which this is a part.

"Commissioner Boswell: Let's make this correction. Let the record show for your own information on your own individual exhibits the one previously marked Exhibit PS-1A, B, and C will be Exhibit PS67-A, B and C. Now, the one you have before you can be Exhibit PS-68.

"Mr. Blake: That's right, sir."

The last exhibit introduced at the original hearings, incidentally, had been marked Exhibit PS-66. And but a short time later at this hearing when it became evident that the Public Service Companies had shifted the theory of their case from one to compensate for increased labor costs to one

to establish a fair return on an adequate rate base, Commissioner Boswell, in overruling the objections raised to the introduction of proof to the latter end, stated:

"We feel under those circumstances that the *petition in this case* is broad enough to admit various types of proof even in addition to the type that may have been submitted by the company today if the company desired to do so." (Italics supplied.)

And still later when the companies called a witness who had last testified at the hearings in 1948, this remark was made:

"Commissioner Boswell: Mr. Warner, you were sworn in the earlier proceeding but since you haven't been sworn in the *supplementary proceeding*, I would like to do it again." (Italics supplied.)

From the foregoing it is apparent that it was clear to all parties from the very outset of the 1949 hearings that this was but a continuation of the previous case, that the proceeding was still the same one that had been instituted by the companies' petition, and that the order to show cause had merely been the means of reopening the case and requiring the companies to go forward with further proof in support of their petition for a rate increase.

That the proceeding commenced on October 30, 1947, was not finally concluded by the Board until the Decision and Order of December 14, 1949, was entered is further evidenced by the fact that in arriving at the conclusions therein set forth the Board referred to and considered the entire record and the evidence, such as it is, therein contained. Furthermore, in its introductory statement the Board stated:

"In our decision of May 5, 1948, being mindful of the uncertainties inherent in the estimates of the future results to be realized from the increased fares allowed, we expressly reserved jurisdiction in the matter for the purpose of giving further consideration to the effect of the new fares so that if it should appear that a revision of the fare schedules therein approved should be required in the public interest, we could on our own motion institute such revision. If we had closed the proceeding and had not reserved jurisdiction, the burden of proof to show that the seven cent fare was unjust and unreasonable would

have rested upon the Board, as representing the public. The result of our reserving jurisdiction is that the burden of proof to show that the seven-cent fare is just and reasonable is upon the applicants. We also required the applicants to submit monthly statements of operating income under the revised fares."

In the light of these facts this Court cannot but conclude that the order of May 5, 1948, was a temporary or provisional one intended only to apply for an experimental period; that when the Decision and Order of December 14, 1949, was entered the provisional order spent its force and was no longer operative; and that the order of December 14, 1949, contains the sole present authority for increasing the basic fare from five to seven cents. It therefore follows that this appeal by the State brings before the Court the propriety of the entire proceeding and that the issue presently before the Court is whether, on the basis of the record before it, the increase in the basic fare from five to seven cents was just and reasonable.

### III.

The remaining points presented to us are all concerned with the principal question raised on this appeal: is the action of the Board in increasing the basic rate of the Public Service Companies from five to seven cents valid? It is well recognized that rate making is a legislative and not a judicial function, and that the Board of Public Utility Commissioners, to which the Legislature has delegated its rate-making power, is vested with broad discretion in the exercise of that authority. *O'Brien v. Board of Public Utility Commissioners*, 92 *N. J. L.* 44 (*Sup. Ct.* 1918); affirmed, 92 *N. J. L.* 587 (*E. & A.* 1919); *Atlantic City Sewerage Company v. Board of Public Utility Commissioners*, 128 *N. J. L.* 359 (*Sup. Ct.* 1942); affirmed, 129 *N. J. L.* 401 (*E. & A.* 1943). For the delegation of the legislative function to be valid under our Constitution it is essential that adequate standards be prescribed by the Legislature and adhered to by its agent, in this instance the Board. *Van Riper v. Traffic Telephone Workers' Federation of New Jersey*, 2 *N. J.* 335

(1949); *State Board of Milk Control v. Newark Milk Co.,* 118 *N. J. Eq.* 504 (*E. & A.* 1935). The statutory standard prescribing the rate-making powers of the Board is to be found in *R. S.* 48:2–21(b) (1) which provides that the Board may "Fix just and reasonable individual rates * * * whenever the Board shall determine any existing rate * * * to be unjust, unreasonable, insufficient or unjustly discriminatory or preferential." In any case in which the reasonableness of the fixed rate is challenged and the fulfillment of the statutory standard thereby subjected to judicial review, the court is duty bound to weigh the evidence and resolve for itself the issue of reasonableness. *Atlantic City Sewerage Company v. Board of Public Utility Commissioners,* 128 *N. J. L.* 359 (*Sup. Ct.* 1942); affirmed, 129 *N. J. L.* 401 (*E. & A.* 1943); *New Jersey Suburban Water Co. v. Board of Public Utility Commissioners,* 123 *N. J. L.* 303 (*E. & A.* 1939); *Public Service Gas Company v. Board of Public Utility Commissioners,* 84 *N. J. L.* 463 (*Sup. Ct.* 1913); reversed in part, 87 *N. J. L.* 581 (*E. & A.* 1914); but affirmed *in toto* on rehearing, 87 *N. J. L.* 597 (*E. & A.* 1915); and appeal dismissed, 242 *U. S.* 666, 61 *L. Ed.* 552, 37 *Sup. Ct.* 243 (1917). See also *Rule* 3:81–13; *R. S.* 2:81–8. In the last mentioned case the former Supreme Court stated (at *p.* 467):

"The presumption in favor of the acts of a judicial or *quasi*-judicial tribunal does not apply with the same force to a legislative tribunal, nor to a tribunal which possesses not only to some extent the powers of a court but also to some extent the powers of a public prosecutor. A legislative body prescribing a rule for future conduct is not limited by the same considerations of justice as a tribunal required to do justice in accordance with existing rules; and one in the position of a public prosecutor can hardly be supposed to preserve a judicial frame of mind; he is rather in the position of one who is judge in his own cause. Under the Public Utilities act, the commissioners are given extensive powers of legislation and are given the power of initiating proceedings themselves. The manner in which these powers shall be exercised involves often a consideration of large questions of public policy or business wisdom. For example, in this very case the commissioners have fixed a rate for the Passaic district alone, to the exclusion of all other parts of the State in which the gas company by its charter may operate. * * * In such a case there

may perhaps be a fair presumption that the action of the commissioners is dictated by wise policy but hardly that its action is just and reasonable. * * * All these considerations lead us to the conclusion that if there is any presumption in favor of the order of the commissioners, it depends, like the opinion of the court of another state, upon the strength of the reasoning by which it is supported. This is subject, however, to the qualification that in legislative action the courts will not merely substitute their judgment for that of a legislative body.

"We must, therefore, determine for ourselves upon all the evidence whether the former rate for gas in the Passaic district was unjust and unreasonable, and whether the new rate is just and reasonable. The two questions are intertwined. It is true one * * * may be unreasonably high and the other unreasonably low, but if the new rate is just and reasonable, the old rate may fairly be adjudged unjust and unreasonable. If the new rate is unjust and unreasonable, the order must be set aside, and the question of whether the board had jurisdiction by reason of the injustice and unreasonableness of the old rate becomes of no importance. The practical question for us therefore is whether the rate of ninety cents is just and reasonable."

█ The justness and reasonableness of a particular rate of fare can only be determined after an examination of a company's property valuation which constitutes its rate base; its expenses, including income taxes and an allowance for depreciation; and the rate of return developed by relating its income to the rate base. These three factors constitute the first of the two steps referred to by Chief Justice Stone in *Federal Power Commission v. Natural Gas Pipeline Company,* 315 *U. S.* 575, 584, 86 *L. Ed.* 1037, 1048, 62 *Sup. Ct.* 736 (1942), when he said:

"The establishment of a rate for a regulated industry often involves two steps of different character, one of which may appropriately precede the other. The first is the adjustment of the general revenue level to the demands of a fair return. The second is the adjustment of a rate schedule conforming to that level so as to eliminate discriminations and unfairness from its details."

In determining the reasonableness of the seven-cent fare it is incumbent upon the Court to consider the reasonableness of each of these three factors, for it is axiomatic that if any one of the three is not reasonably supported by the proofs, the rate of fare itself is unreasonable.

██ 1. The determination of an adequate rate base is, as the term applies, fundamental in any rate proceeding. The rate base is the fair value of the property of the public utility that is used and useful in the public service. In *Atlantic City Sewerage Company v. Board of Public Utility Commissioners,* 128 *N. J. L.* 359, 365 (*Sup. Ct.* 1942); affirmed, 129 *N. J. L.* 401 (*E. & A.* 1943), a case amply supported by the authorities, it was held that a "utility is entitled to a just return upon the fair value of the property at the time of its employment for the convenience of the public, and the public to protection against unreasonable exactions" and that "a rate based upon an excessive valuation or upon property not used or useful in the renditions of the service subject to such regulation obviously would lay upon the individual user a burden greater than the reasonable worth of the accommodation thus supplied. The public is not to be laden with unreasonable or extortionate rates in order that dividends may be provided for the utility's stockholders. The base rate figure of fair value is determined by viewing the plant as an integral and unitary whole, considering all the elements properly entering into the ascertainment of a reasonable return for supplying the public need. It is requisite that there be 'an honest and intelligent forecast' of probable future values; and this of necessity includes the making of a fair prediction of the probable price and wage levels during a reasonable period in the immediate future, and a consideration as well of all other relevant facts and circumstances."

██ There are a number of formulae useful in the determination of fair value: depreciated original cost, depreciated prudent investment, reproduction cost of the property less depreciation, cost of reproducing the service as distinct from the property, and there are undoubtedly others. But the Board is not bound to and, indeed, should not use any single formula or combination of formulae in arriving at a proper rate base, for the determination of fair value is not controlled by arbitrary rules or formulae, but should reflect the reasonable judgment of the Board based upon all the relevant facts,

*Atlantic City Sewerage Company v. Board of Public Utility Commissioners*, 128 *N. J. L.* 359 (*Sup. Ct.* 1942); affirmed, 129 *N. J. L.* 401 (*E. & A.* 1943). The Board is not free, however, to arrive at a fair value based solely upon a utility's books of account, as the Public Service Companies admit was done in the proceeding here under review. In their brief it is stated:

"The Companies did not contend that the rate base introduced in the proceedings initiated by the Board's Show Cause Order represented the present fair value of the property. * * * It was based upon original cost of plant and property as shown by the books of account plus the reduction of book cost of intangible property, and minus depreciation reserve, with no allowance for working capital. * * *

"Had the Companies sought to establish a rate base upon which to earn a fair return, the evidence introduced would have been of a vastly different character. This, however, was not the case and the use of book cost figures was, therefore, appropriate in the circumstances."

The dangers inherent in accepting the books of account at face value in a rate proceeding are apparent. The prescription of a uniform system of accounts by regulatory commissions, such as the Board of Public Utility Commissioners, has been uniformly accompanied by the qualification that in prescribing the system of accounts, the commissioners do not commit themselves to the approval or acceptance of any item set out in any account for the purpose of fixing rates or in determining other matters before the commission.

Neither this Court nor the Board can accept the books of acount of a public utility at face value in a rate case in which reasonableness is always the primary issue. The failure of the Board to recognize that it was under a duty to go behind the figures shown by the companies' books and get at realities, is well illustrated by the fact that when, on cross-examination by an interested party, one of the principal witnesses for the companies testified that he did not know how much they had paid for a particular bus property, one of the commissioners, instead of requiring the information to be produced, cut short the inquiry into the facts by stating: "He said he did not

know. We have to accept that. He is under oath." It must be emphasized that rate making is not an adversary proceeding in which the applying party needs only to present a *prima facie* case in order to be entitled to relief. There must be proof in the record not only as to the amount of the various accounts but also sufficient evidence from which the reasonableness of the accounts can be determined. Indeed, *R. S.* 48:2–21(d) specifically provides that "The burden of proof to show that the increase, change or alteration [in rates] is just and reasonable shall be upon the public utility making the same." Lacking such evidence, any determination of rates must be considered arbitrary and unreasonable.

In this proceeding the Public Service Companies contended for a rate base of $61,404,587, which, as indicated in our statement of facts, was adjusted by the Board, by the disallowance and adjustment of certain items, to a figure of $47,127,365. No proof was offered by the companies or demanded by the Board to support the items therein included, other than the companies' books of account. The record is thus lacking in sufficient evidence from which this Court can determine whether this rate base is reasonable.

The importance of establishing a proper rate base is clearly demonstrated by the fact that a rate of return of 8.12 per cent is produced if the figure of $3,827,054, representing the companies' adjusted operating income as found by the Board, is related to a rate base of $47,127,365, whereas the rate of return is in excess of 12 per cent if the $17,233,538 allegedly representing the cost of intangible property related to the organization and acquisition of the various auto bus properties is eliminated from the rate base. At the hearings it was said that this figure reflected the difference between the purchase price and the value of the tangible property of the many independent bus routes acquired by the Public Service Companies from time to time. The Board found that these intangibles resulted from expenditures made by "arm's length bargaining" and that they "continue to represent functional value and have not been recouped by the investors." Such a finding,

however, is merely a conclusion unsupported by any evidence in the record. On the other hand it would appear that in a proceeding before the Securities and Exchange Commission under Section 11(g) of the Public Utility Holding Company Act of 1935 (15 *U. S. C.,* § 79 *et seq.*), the Public Service Companies, as an integral part of a plan designed by them to preserve their utility holdings throughout the State, proposed to the Securities and Exchange Commission to eliminate from their fixed capital accounts some $50,517,409 of intangibles applicable to their street car and bus properties, including the $17,233,538 of intangibles here included by the Board of Public Utility Commissioners in their rate base. All but $7,500,000 of this amount was to be taken out of surplus according to the Public Service proposal (the entire amount was not written off at once because of the fact that it would have resulted in a capital deficit), and this $7,500,000 was to be amortized out of net income at the rate of at least $500,000 a year. This proposed plan was effectuated after hearings by an appropriate order of the Securities and Exchange Commission on December 30, 1947, which was approved in three orders of the Board of Public Utility Commissioners on March 18, 1948.

In spite of these proceedings and without any reference to them in its decision and order and without any proper evidence before it, the Board allowed the inclusion of the $17,233,538 as the cost of intangible property related to organization and to the acquisition of auto bus properties now included in the state-wide system of the Public Service Companies. The burden is on the companies, as hereinbefore stated, *R. S.* 48:2–21(d), *supra,* to establish by competent evidence that the items comprising this sum are properly includable in the rate base. It is the recognized rule in this State that an allowance may be made for value as a going concern in determining the rate base, if there is sufficient evidence to determine its amount, and if it has not been included elsewhere in the valuation of the property, and if it has not been recouped from the prior earnings of the business.

*Atlantic City Sewerage Company v. Board of Public Utility Commissioners,* 128 *N. J. L.* 359 (*Sup. Ct.* 1942) ; affirmed, 129 *N. J. L.* 401 (*E. & A.* 1943) ; *Public Service Gas Company v. Board of Public Utility Commissioners,* 84 *N. J. L.* 463 (*Sup. Ct.* 1913) ; reversed in part, 87 *N. J. L.* 581 (*E. & A.* 1914) ; but affirmed *in toto* on rehearing, 87 *N. J. L.* 597 (*E. & A.* 1915) ; and appeal dismissed, 242 *U. S.* 666, 61 *L. Ed.* 552, 37 *Sup. Ct.* 243 (1917).

 Going concern value, however, is not to be confused with that intangible value which may attach to a franchise from the State and which may not be included in the computation of a rate base. *R. S.* 48 :3–5 provides that no public utility shall "Capitalize any franchise to be a corporation" or "Capitalize any franchise in excess of the amount, exclusive of any tax or annual charge, actually paid to the state or any political subdivision thereof as the consideration of the franchise." The question as to whether the intangible value of a franchise from the State is properly to be included in a rate base was one of the principal issues in the case of *Public Service Gas Company v. Board of Public Utility Commissioners,* cited *supra.* Mr. Justice Swayze, writing the opinion for the former Supreme Court, said in that case (84 *N. J. L.* 463, 480) :

"But where, as in this case, the rate is not fixed and may be changed, there is no stable basis upon which to calculate the value of the franchise, since that value is dependent upon the rate. The rate must indeed be reasonable, but to assume a value for the franchise in order to determine the reasonableness of the rate is to reason in a circle ; the value and the rate are mutually dependent, and one must be fixed independently if it is to form a basis for the calculation of the other."

On appeal this holding was reversed by the Court of Errors and Appeals (87 *N. J. L.* 581). Subsequently, however, a reargument was ordered and the Court of Errors and Appeals changed its position (87 *N. J. L.* 597) and affirmed the judgment under review for the reasons expressed in the opinion below by Mr. Justice Swayze. An appeal from this decision of the Court of Errors and Appeals was dismissed by the

United States Supreme Court (242 *U. S.* 666). We also consider that it makes no difference whether the franchise is obtained by the utility directly from the State (or a political subdivision thereof) or is purchased from another utility. The rate charged the public for the same service cannot be compounded merely by the sale of a franchise as part of a business by one utility to another even where the transaction is at "arm's length."

2. Equally as important as arriving at a proper rate base in a proceeding such as this is the necessity of determining the reasonableness of the items of expense to be allowed in computing the operating and net income of the utility. This should be a matter of especial inquiry in the situation that here exists where one of the petitioning companies, Public Service Interstate Transportation Company, is a wholly owned subsidiary of the other applying company, Public Service Coordinated Transport, which in turn is a wholly owned subsidiary of Public Service Electric and Gas Company. Under these circumstances the amount of certain items of expense, *i. e.,* joint terminal and office facilities and joint supervisory personnel, are fixed not by the competition of the market place but by the parent companies.

The reasonableness of the seven-cent fare cannot be intelligently determined in the present absence of competent evidence by which to measure the reasonableness of the allowed expenses, for with a given revenue the companies' income varies directly with the amount of their expenses and the rate of return fluctuates according to the ratio between their income and the rate base. Much that has been said with respect to the adequacy of the proof as to the rate base is here applicable. A utility in a rate proceeding must bear the burden not only of proving the amount of its operating and other expenses, but also the burden of proving the basis of the charges to its expense accounts and the propriety of including such charges for rate-making purposes.

It should be mentioned here that if the annual amortization of the $17,233,538 of intangibles is to be properly treated as

a deduction from annual operating revenue in determining allowable expenses for rate-making purposes, the companies again bear the burden of proving the validity of such deduction, *R. S.* 48 :2–21 (d), *supra*.

We are not unaware of the provisions of *R. S.* 48 :2–32 to the effect that the Board is not bound by the technical rules of evidence and is thereby permitted, as indeed are all administrative agencies, to consider matters which might not be admissible in a court of law, without it constituting error. Nevertheless, there must still be sufficient competent evidence in the record to support the reasonableness of the rates arrived at, since a court is of necessity restricted upon a review of the rates fixed by the Board to a consideration of the record before it.. If this were not so, the right of an interested party to a review of the Board's determinations would be a meaningless formality, for the decision of the appellate tribunal under such circumstances would be the result of but guesswork or caprice.

3. The reasonableness of the rate of return is likewise a factor to be considered in any rate proceeding. In the instant case the Board found, among other things, that the rate of return computed on a rate base of $47,127,365 with an adjusted operating income of $3,827,054 would be 8.12 per cent, although this is reduced to 7.56 per cent if the net additions of $3,512,053 to plant and equipment made during the first six months of 1949 be added to the rate base. It was also found that the net adjusted income for the first full twelve months of operation under the seven-cent fare amounted to $2,752,463. This net income is equivalent to a return of 9.41 per cent on a share of the companies' stock having a stated value of $60. The Board also indicated that for the calendar year 1948 the return per share was 4.1 per cent; and for the 22-month period, January 1, 1948, to October 31, 1949, the return per share was 5.57 per cent. Obviously, however, these latter two figures have no relation to the reasonableness of the seven-cent fare and should not be considered, for both include six months of operation under the previous five-cent fare. By

way of contrast, if the $17,233,538 of intangibles are excluded from the rate base found by the Board and a resulting base of $29,894,827 compared to the $3,827,054 adjusted operating income used by the Board, the rate of return becomes 12.8 per cent. This is manifestly extortionate and unreasonable, particularly in view of present day low interest rates. It is to be noted, furthermore, that in its decision of May 5, 1948, when the fare was originally increased from five to seven cents, the Board itself considered that an estimated return of approximately 5 per cent was reasonable.

Because the Public Service Companies made much of the fact that they were one of the few transportation systems in the country still operating on a five-cent fare, it should be mentioned in passing that such comparisons are of little value in this case. The Public Service Companies' routes have been divided into zones on the basis of the five-cent fare. The size of a zone together with the amount of the fare determines the actual charge made for transportation service. For this reason any comparison with rates elsewhere must be made on the basis of the length of ride obtainable for a given fare, and not just by a comparison of the fares themselves. It may well be that if such a comparison were made, it would be discovered that the real charge being made to the riding public of this State is in excess of that in other localities, even though, at first blush, it might appear that the charges elsewhere were higher.

██ ██ The State has suggested that this Court fix as reasonable a rate of 4.5 to 5 per cent on a rate base of $30,000,000. This we cannot do for two reasons: first, as previously indicated, the record is lacking in evidence from which a proper rate base can be determined; and second, the power to fix rates is not a judicial function, but a legislative one, and the State has created the Board of Public Utility Commissioners as its agent for that purpose, *Hackensack Water Company v. Board of Public Utility Commissioners,* 96 *N. J. L.* 184 (*E. & A.* 1921). The chief power of this Court in rate cases is to review the reasonableness of the rates

fixed by the Board. We can say, however, that the rate which a public utility may reasonably charge should be sufficient to encourage good management and furnish a reward for efficiency, to enable the utility, under efficient and economical operation, to maintain and support its credit; and to enable it to raise money necessary for the proper discharge of its public duties. It can never be more than the reasonable worth of the service supplied; neither can it be fixed so low as to be confiscatory. If within these limits and supported by competent evidence, rates set by the Board would clearly be just and reasonable.

It has been amply demonstrated on this appeal that the action of the Board of Public Utility Commissioners in raising the basic fare for the Public Service Companies from five to seven cents was unsupported by the evidence and is, therefore, unreasonable and unlawful. Since no adequate rate base for the Public Service Companies has ever been properly established, it is our judgment that any increase in rates granted on the basis of *O'Brien v. Board of Public Utility Commissioners,* 92 *N. J. L.* 44 *(Sup. Ct.* 1918); affirmed, 92 *N. J. L.* 587 *(E. & A.* 1919); would be patently unreasonable. Accordingly, and pursuant to the provisions of *R. S.* 48:2–47, the May 5, 1948, and December 14, 1949, orders of the Board of Public Utility Commissioners which raised the rate of fare of the applying companies from five to seven cents are hereby set aside as unjust and unreasonable and the case is remanded to the Board of Public Utility Commissioners so that these proceedings may be continued, upon due notice to the public and the interested municipalities, to the end that an adequate rate base and a permanent rate may be established pursuant to statute and not inconsistent with the opinion of this ourt.

## ON PETITION FOR REHEARING.

PER CURIAM. No judge who voted with the opinion having moved a rehearing the petition for rehearing is, under the practice of the Court, denied.

In view of the unusual nature of the petition for rehearing, in the face of a unanimous decision of the Court, it may be well to summarize the steps in the consideration of the case. The matter was first considered on the State's petition for certification which was opposed by the respondent companies but which we granted. After the briefs and the accompanying appendices on the appeal were filed, each Justice not only studied the briefs but, in line with our practice, prepared his individual typewritten memorandum thereon. The time for oral argument was enlarged on each side and two intervenors representing independent bus lines were also heard. Every aspect of the case was considered at length at our weekly conference preliminary to the drafting of an opinion. The draft was likewise discussed intensively in conference and changes were made so that the opinion might reflect the views of every member of the Court, which, in its revised form, it does. The course pursued is our normal procedure. The only distinctive features in the case were the procedural question discussed in the opinion and the complications resulting from the respondent companies having turned an emergency rate application into a permanent rate base proceeding without notice to interested parties. This was unprecedented.

The petition for rehearing has likewise been considered by every member of the Court except Mr. Justice Case who had left the country on vacation before the petition was distributed and we have all also conferred with respect thereto. As to the matters therein contained which were briefed and argued and were properly before us for decision we find nothing in the petition for a rehearing that casts any doubt on our opinion, if impartially read.

 The matters mentioned in the petition for a rehearing that have arisen since the order under review are not properly before us on this appeal. Nor have we the power to bring them before us before they go to the Board of Public Utility Commissioners. We were especially concerned with the statement in the petition for rehearing:

"Subsequent to the issuance of the Opinion of this Court the Petitioners requested the Board of Public Utility Commissioners to enter into negotiations for a temporary rate pursuant to *R. S.* 48:2–21.1 which provides:

" 'The board may, during the pendency of any hearing instituted by it, on its own initiative or on complaint, in which the approval or fixing of just and reasonable individual rates * * * is in issue, or at any other time, negotiate and agree with any public utility for an adjustment of the individual rates * * * for any product or service supplied or rendered by such public utility. Such adjustment may be for, or without, a specified limit of time. In no event shall any such adjustment be regarded as contractual. Such adjustment shall at all times be subject to change through the proceedings provided for by this chapter, or through negotiation and agreement under this section. The board as a part of any such negotiation and adjustment shall provide for the continuance, suspension or other disposition of any hearing of the character aforesaid then pending.'

"The Board of Public Utility Commissioners refused to proceed as provided for by that statute, basing their refusal upon the Decision and Mandate of this Court which they interpret to require further hearings on the Petition filed by the Petitioners on October 30, 1947."

We therefore asked the Board of Public Utility Commissioners for a copy of such application, order of refusal and the Board's minutes relating thereto. Under date of July 10, 1950, the President of the Board informed us by letter:

"I am informed by Emmett T. Drew, Secretary of the Board of Public Utility Commissioners, that you have requested copies of any application made by Public Service Coordinated Transport and Public Service Interstate Transportation Co. seeking to have this Board negotiate a temporary rate under authority of *R. S.* 48:2–21.1 together with copies of any order denying the application and the Board's minutes with respect thereto.

"Please be advised that no formal proceedings have been taken by P.S.C.T. and P.S.I.T. companies in this matter and therefore the records sought cannot be supplied.

"In this connection I wish to make special reference to Pages 16 and 17 of the petition for rehearing filed by these companies, in order to inform the court of the exact facts.

"On June 28, 1950 William H. Blake and Winslow Ingham, attorneys for the two companies, came to the Board's offices at Newark for a conference. They asked whether the Board would be willing to negotiate a temporary rate and they were promptly informed by

each member that we would not do so *under any circumstances*. They then said they would write a letter making the request and desired our reply in confirmation of our statement that we would not negotiate a temporary rate. This letter has not been received."

Suffice it for us to say that nothing in our opinion in any wise limits the power of the Board of Public Utility Commissioners under *R. S.* 48 :2–21.1. That statute was not construed by us in our opinion. It may be pertinent, however, to observe that it was passed in 1935 as Chapter 49, 17 years after the *O'Brien case*, which was decided in 1918. We cannot assume, as the petition for rehearing would have us do, that a coordinate branch of the State Government will not do its full duty when the case is remanded to it, which will be done forthwith.

The petition for reargument is denied and the matter will be remanded at once.

*For reversal and remandment*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING and ACKERSON—7.

*For affirmance*—None.